In the Matter of the Application of THE VILLAGE OF WELLSVILLE, NEW YORK, Petitioner, to Review a Determination against MILO R. MALTBIE and Others, Constituting the Public Service Commission of the State of New York, and PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondents.

Third Department, November 1, 1939.

*Andrews, McBride & Fennell* [*Harold H. McBride* of counsel], for the petitioner.

*Gay H. Brown, Counsel to Public Service Commission* [*Laurence J. Olmsted, John T. Ryan* and *Porter L. Merriman* with him on the brief], for the respondents.

FOSTER, J. This is a review of an order of the Public Service Commission which directs the petitioner to strike from its operating property accounts proposed journal entries in the total sum of $31,667.64. These entries represent items which petitioner sought to write into its capital accounts, and are detailed as follows:

(1) An item of $28,061, alleged to consist of overheads which petitioner paid to its superintendent and his assistant engineer, and charged currently to operating expenses for twenty years.

(2) An item of $2,858, stated to represent " going concern cost," of which $1,700 was formerly charged to operating expenses, and $1,158 of which was formerly charged to fixed capital accounts.

(3) An item of $748.64, claimed by petitioner as an organization expense, no part of which was previously charged to fixed capital.

A slight historical sketch may serve to clarify the controversy. Petitioner operates what may be fairly called a small municipal electric plant, which was established in 1915. In that year it had 238 customers. By 1936 the number had increased to 1,938. During the intervening twenty odd years there have been nine distinct periods of construction. The present plant superintendent has been in charge since 1920, and its accounting system has been under his supervision and direction since that date. He is not an expert accountant.

On March 1, 1936, the Public Service ·Commission prescribed a uniform system of accounts for municipal electric utilities. Prior to that time there had been no such system legally applicable to such utilities, although one had been established for other utilities. While not required to comply with the system prescribed for private utilities in 1909, and as amended in 1923, nevertheless petitioner attempted to do so through an interpretation of its superintendent.

The record indicates that due to errors in the method of its accounting system petitioner failed, during a period of twenty years, to charge into its capital accounts a part of what are termed construction overhead costs. This embraces engineering and supervision of new construction, and other administrative details connected therewith, performed by its superintendent or his assistant engineer. These overhead costs were erroneously charged to operating expenses. In other words, that portion of the salaries and expenses of the superintendent and his assistant engineer that would have been properly allocated to construction work, and, therefore, chargeable to fixed capital, was never separated from that portion of salaries only applicable to maintenance, repairs and operations, and properly chargeable to operating expenses.

The significance of this error, according to petitioner, was not discovered until December, 1935, when it undertook to prepare an inventory and appraisal of all of its operating properties in

order to comply with the requirements of the uniform system of accounts. It also discovered then that the cost of securing 1,700 new customers, between 1915 and 1935, had never been capitalized, and its engineer estimated this cost at $1,700. This sum was accordingly added to its capital accounts. The sum of $1,158, which added to the $1,700 makes up the rejected item of $2,858, was always carried by petitioner in its capital accounts as the cost of securing 238 primary customers, and as a part of the purchase price paid the predecessor utility.

At the same time it was also discovered that the sum of $748.64, which the village had spent for investigating and appraising the utility property before its acquisition, had not been entered in fixed capital accounts. It was, therefore, transferred.

By far the largest items were overhead costs. These were computed by petitioner's engineers, and ran about eight per cent of the fixed capital accounts to which they were applied, amounting in all to the sum of $28,061. The method of arriving at the percentage used in estimating these costs was to find the ratio the total sums paid for the supervision and administration over twenty years bore to the total amounts expended for operating expenses, maintenance, repairs and construction over that period. $83,498 was the total cost of supervision and administration. The total figures for operating expenses, maintenance, repairs and construction were $1,045,082. A division of the former by the latter gives a percentage of 7.99 which was set up as eight per cent.

This method of estimating proceeded upon the theory, as voiced by the opinion of petitioner's engineer, that it cost as much to administer and supervise a dollar of construction as it does to regulate and manage a dollar of operation. It may be added that the proof in this regard was uncontradicted. On this basis the amount in each fixed capital account was increased by this average cost, or eight per cent.

Overhead costs thus estimated have been rejected by the Commission on the ground that they are wholly theoretical, and the assumption that they were made is wholly unwarranted. It seems obvious, however, that the original plant could not have gone through nine distinct phases of construction since 1915, and grown from a property purchased for the sum of $62,500 to a property worth now, by the Commission's own figures, the sum of $357,600.70, without supervision for such construction. And the uncontradicted evidence is that the petitioner's present operating properties could not be created without overhead costs for such supervision. Moreover, the report of the Commission's own engineer shows that no supervision or administration was ever charged to capital accounts.

Since the overheads were nowhere segregated and actually reported they could only be arrived at by estimates. The uniform system of accounts expressly provides for estimates where records are not available. (Instruction No. 22, subds. B and C.) The assumption that it costs as much to administer a dollar of construction as a dollar of operation is apparently not challenged. Since the ratio obtained on such basis is applied to all construction within the period affected, it is difficult to see how a more accurate estimate could be made. Whether there was an equal division of supervision between construction, maintenance and repairs is immaterial, since the percentage is applied to all construction within the period, regardless of the time when it was accomplished.

But the Commission contends, even if the overheads had a basis in fact, since they have been once charged to operating expense accounts they cannot now be charged to fixed capital accounts so as to increase the latter. This contention is based largely upon two grounds: (1) That the character of the charges was determined by petitioner's officials at the time they were made, and that those amounts represent a deliberate determination of such officials at the time; (2) that in considering the historical cost of operating properties petitioner cannot include items charged to operating expenses because such expenses have already been paid by consumers in current revenues.

There is authority to sustain the Commission's view in principle. (*Los Angeles Gas & Electric Corporation* v. *Railroad Commission,* 58 F. [2d] 256.) The decision of the District Court in that case was affirmed (289 U. S. 287), but the United States Supreme Court did not pass upon the propriety of correcting capital accounts by charging thereto overheads formerly charged to operating expense. In mentioning the point the court said: " We noted at the outset that there is a difference between the parties with respect to the amount which should be taken as historical cost. The Company contends that in entering additions and betterments in its books it charged too little to capital account for overheads, and it directs attention to the opinion of the Commission's engineers that 11.25 per cent of direct labor and material items could reasonably have been charged to capital for indirect construction costs instead of 6 per cent, the amount actually charged. The difference is over $2,000,000. With an allowance of 11.25 per cent for overheads, the Commission's engineers estimated the historical cost of fixed property at $61,019,662, instead of $58,842,187, allowed by the Commission. It is unnecessary to review the contentions upon this point, as if the valuation were made at the higher figure, while it would exceed the $60,704,000 found by the Commission as historical cost, it would still be under the amount of $65,500,000 which the Com-

mission took, on the basis of fair value, as an undepreciated rate base."

Superficially the facts as decided by the District Court appear similar to the proceeding here. In the *Los Angeles* case the company charged all overheads, except about six per cent thereof, to operating expenses for a period of sixteen years. When a correction was sought to be made the regulatory body denied it, and this denial was affirmed by the District Court.

However, it was found as a matter of fact that the company in such case was definitely advised of the propriety of allocating more of the items in controversy to capital and less to operation, but despite such definite advice the company declined to follow the suggestion of the Commission and charged all of such expenditures to operating expenses. It was held, in view of such definite advice, that either the responsible officials of the company made the allowance in the exercise of their best judgment at the time when all of the facts were fresh in their minds or, for reasons presumably to the advantage of the company, deliberately undercharged capital and overcharged operations.

Therein, I think, rests a cogent factual distinction between such case and the proceeding here. The petitioner in this case had no exact guidance or instruction, but was only regulated and supervised by the Commission in a rather loose and perfunctory manner. Its superintendent, though in charge of the bookkeeping, was not an expert accountant. It was a small utility and he had many duties to perform. He followed the system of accounts prescribed for private utilities as best he could interpret it. Under such circumstances his error cannot be justly found to be a deliberate error of judgment after full and complete knowledge of a choice between two systems, such as was found in the *Los Angeles* case. Rather it was a mechanical error made in an effort to interpret a system that is still subject to some controversy, and, therefore, should not be conclusive against petitioner.

This court has already held that overheads should be allowed even though they were originally charged to operating expense (*People ex rel. New York State Railways* v. *Public Service Commission*, 202 App. Div. 576), and also in the same case that a readjustment is not to be denied because of past profits or larger net earnings due to mistakenly enlarged operating expenses. The weight to be given to this decision is not overcome by the *Los Angeles* case since in the latter case the United States Supreme Court did not pass upon the point involved, as has heretofore been pointed out. Nor is the case of *Knoxville* v. *Knoxville Water Co.* (212 U. S. 1), as cited by respondents, controlling. It is true that the

court there held that a utility will not be permitted to capitalize on past errors, but the facts therein stated indicate that the error assigned was one of management and not of bookkeeping.

The argument that customers have paid the overheads charged to operating expenses is not tenable. Customers pay for nothing but service. They do not pay for the property, and their payments are not contributions to depreciation or other operating expense, or to capital of the company. (*Board of Commissioners* v. *New York Telephone Co.*, 271 U. S. 23.)

The essence of this controversy involves accounting, and it would seem that sound accounting procedure requires a correction of errors in bookkeeping whenever found to be the result of inadequate knowledge or instructions. The actual cost of property is a relevant fact, whether a rate case or a bookkeeping entry case is being considered. The exclusion of such a relevant fact is bound to affect valuations and amounts to confiscation. (*Matter of New York Edison Co.* v. *Maltbie*, 244 App. Div. 685; affd., 271 N. Y. 103; *People ex rel. Iroquois Gas Corporation* v. *Public Service Commission*, 264 id. 17.) To exclude overhead costs is to deprive petitioner of a relevant fact that amounts to more than a theory. Temporary rates may be prescribed upon the book cost with which we are here concerned. (Public Service Law, § 114.) It seems inevitable also that book figures for costs will be evidence as to the valuations of petitioner's operating property in any proceeding concerned with valuations or rates.

The conclusion of the Commission that the overheads claim was wholly theoretical is not sustained by any substantial evidence, and quite to the contrary there is fair evidence that such overheads were actually incurred. The conclusion that such overheads, assuming them to have been actually incurred, having once been charged to operating expenses cannot now be corrected and charged to capital accounts is not sustained as a matter of law. For reasons heretofore indicated the action of the Commission in directing that these overheads be stricken out should be annulled.

I take the same view with relation to the item of $1,158. This was actually paid by the utility to its predecessor as a part of the cost of the concern. However it may be labeled, it was indisputably an item of capital cost, and so carried on the books of the utility for twenty years.

As to the item of $1,700, that being the estimated average cost of inducing the additional customers to take service, the evidence is too speculative to warrant a rejection of the Commission's conclusion in regard thereto. There was no evidence that any money was ever expended, or that it was necessary to expend any, for that purpose.

The Commission has discarded the sum of $748.64, used for the purpose of investigating and appraising the plant before purchase, on the ground that $515.12 of this sum was a payment by the village and not by the utility; and that the balance of $233.52, representing expenses incurred during the negotiations for purchase, was charged as an operating expense. There is evidence to show that both items were necessarily expended in the purchase of the property, and thus in the creation of the utility. No authority is cited to sustain the Commission's rejection of these items, and in view of the clear purpose for which they were devoted the action of the Commission is unjustifiable. Such items represent in part the cost of the plant, used and usable in the public service, and there is no presumption that such plant is not now in existence.

The determination should be annulled in the particulars indicated in this opinion, and the matter remitted to the Commission.

HILL, P. J., CRAPSER, BLISS and HEFFERNAN, JJ., concur.

Determination annulled, with fifty dollars costs and disbursements, and matter remitted for action in accordance with opinion.