In the Matter of the Application of LONG BEACH GAS COMPANY, INC., Petitioner, for an Order under Article 78 of the Civil Practice Act, against MILO R. MALTBIE and Others, Individually and as Members of and Constituting the Public Service Commission of the State of New York, Department of Public Service, State Division, and the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondents.

Third Department, July 1, 1942.

*Charles G. Blakeslee* [*Charles G. Blakeslee, John J. Donohue* and *Edward J. Crummey* of counsel], for the petitioner.

*Callaghan, Stout & Nova* [*Stephen Callaghan, Ralph Stout* and *Thomas A. Gaffney* of counsel], for the petitioner with respect to the Phillips fee.

*Gay H. Brown* [*George H. Kenny* and *Harry T. O'Brien, Jr.,* of counsel], counsel to Public Service Commission.

FOSTER, J. Petitioner is a gas corporation as defined by the Public Service Law. On May 28, 1940, and on its own motion, the Public Service Commission ordered an investigation of petitioner's methods of accounting to determine whether particular outlays and receipts had been entered, charged or credited to proper accounts, and to determine the original cost of property used in the public service and the amount of depreciation accrued thereon. Hearings were conducted, culminating in an order of the Commission, dated March 19, 1941, which directed petitioner to place certain journal entries in its books and accounts to reflect the original cost of its property as of January 1, 1938, and to otherwise correct its accounts in accordance with the findings of the Commission. Among other things petitioner was directed to eliminate certain items from its capital accounts and to charge the same to surplus. We are asked to review the determination and order of the Commission with respect to these items.

The items involved are these:

(a) The sum of $25,000 paid to one George Macdonald for services alleged to have been rendered in connection with petitioner's organization;

(b) The sum of $33,532.16 which relates to property no longer in existence and which should have been retired from petitioner's capital accounts;

(c) The sum of $9,706.31, of which $9,111.81 represents a fee paid to E. L. Phillips & Co. for engineering and construction work, and $594.50 which represents arbitrary overhead costs.

The organization fee of $25,000 was paid to Macdonald in 1916, and for over twenty years was carried on petitioner's books as part of its fixed capital in an account entitled " Organization." The only evidence, other than the entry itself, now extant, as to the precise nature of Macdonald's services is contained in a voucher

which describes his service as follows:

"To services and expenses in connection with promotion and organization of the Long Beach Gas Company including legal expenses; examination of the trust mortgage of the Long Beach Estates; investigation and examination of the legal matters in connection with the incorporation of the Village of Long Beach as to their jurisdiction over streets and highways; preliminary engineering expenses and hiring of engineers for the purpose of ascertaining the amount and character of the gas distribution system laid at Long Beach; character of the soil; preliminary engineering maps in connection therewith; conference with officers of the Estates of Long Beach at Long Beach and New York City; preliminary and tentative contracts drawn up and negotiations for extension and purchase of gas mains; conference with officers of the Incorporated Village of Long Beach; attendance at hearings at Long Beach in connection with introduction of gas therein; attendance upon hearings, mass meetings of the taxpayers and citizens of the Village of Long Beach regarding gas; expenses in connection with preparing and distributing circulars to interest the citizens, householders, architects, etc., in the introduction of gas; attending conferences and hearings relative to the incorporation of the Long Beach Gas Company and subsequent purchase for the Long Beach Gas Co. of the gas distribution system. All work in connection with above extending from 1912 to 1916......................... $25,000 00."

The action of the Commission in eliminating this item from petitioner's organization is based upon the fact that while the supporting voucher describes some services which are properly classified in the organization account under the accounting system now in vogue, and the system in effect in former years, it also includes services which cannot be properly so classified; and since petitioner is now unable to break down the total figure, so that a correct allocation of the various items thereunder can be made, the whole amount must be eliminated from capital and charged to surplus.

This is a harsh decision to make concerning an account which has been carried for more than twenty years, and concerning which the voucher on its face indicates that all of the items therein but

one are indisputably items of capital expense. The sole exception is the item of expense incurred in the preparation and distribution of circulars to interest citizens, householders, architects, etc., in the use of gas. Assuming this to have been an operating expense and not a capital charge, as found by the Commission, certainly the reasonable inference is that the amount thereof was insignificant in comparison with the total fee. But it is by no means clear that this item should not be considered as a part of the cost of securing primary gas consumers and treated as an item of capital expenditure. (*Los Angeles Gas Corp.* v. *R. R. Commission*, 289 U. S. 287; *Matter of Village of Wellsville* v. *Maltbie*, 257 App. Div. 746.) The latter construction is equally as plausible as the former. Moreover, organization expense, as defined in the system of accounts in effect when the fee was paid, and also as defined in the present system, includes expenditures for organizing a corporation or other entity, "*and putting it into readiness to do business.*" This definition itself is fairly broad, and when confiscation will otherwise result we think that it should receive a liberal interpretation.

We are not unmindful that there are two other items included in the voucher, viz., expense for preliminary engineering and for the extension and purchase of gas mains, which it may be technically improper to classify in an organization account because other accounts are provided for them. They are nevertheless conceded to be items of capital expense. Again it is by no means clear that the expense connected with these items was not incurred in putting the corporation in readiness to do business.

No fraud, no padding, no impropriety of any kind except neglect, is charged in connection with the payment of this fee. Doubtless petitioner should have secured and kept better data to support it in detail. But twenty years is a long time, and during that period there have been several examinations of petitioner's accounts when permission was sought to issue securities, and yet this fee, which certainly was not obscure, entirely escaped criticism. There is some force to the argument that if it had been criticized within a reasonable period petitioner would have been able to secure data to adequately support it. We do not hold that the Commission is estopped on account of this, but we do say that this circumstance was and is entitled to some weight in appraising the subject-matter of a supporting voucher after a lapse of twenty years, especially in view of the fact that a direction to charge the whole fee to surplus amounts to confiscation of a part of petitioner's capital structure.

As we construe the supporting voucher in the light of all the circumstances it is equally plausible to hold that all of the items

described therein relate to capital expense as it is to say that one of them relates to operating expense, and that two others, while capital expense, cannot be classified in an organization account. We reiterate the view that in such a case, where two constructions are equally plausible, the one that leads to confiscation must be rejected as a matter of justice and principle. It follows from the application of this rule that the determination of the Commission with respect to this item was not justified by the law or the facts, and should be annulled.

We now come to the amount of $33,532.16 which was eliminated from capital and charged to surplus. This amount consists of two items; one of $27,381.46 relating to service and stubs laid in anticipation of a real estate development; and the other of $6,150.70 relating to a steam line. No proof was adduced to establish the present existence of any of this property and it is conceded that all of such property is not now in service and cannot be located. As a matter of fact the proof indicates that such property has been out of service for a number of years, but the precise time or times at which it was retired is apparently unknown. These items were placed by petitioner in one of its capital accounts: i. e., Account 105, Gas Plant Acquisition Adjustments, instead of being charged to its retirement reserve under the accounting system in force at the time the loss was discovered, and thus eliminated at that time from its capital accounts. Petitioner evidently recognizes that an error was made in this entry for it makes no claim now that these items should be included in its capital accounts. It does claim, however, that they should not be charged to surplus. Beyond that it presents no clear proposal as to what accounts they should be charged, but presumably it claims that these items should be charged to capital reserve for depreciation under the new system of accounts effective as of January 1, 1938. The Commission acknowledges that this might be the natural procedure if adequate provision had been made in the past to meet depreciation, or to provide a reserve to which all retirement losses might be charged, but as of January 1, 1938, the balance in petitioner's depreciation reserve account was only $5,527.38 for property having an original cost of nearly $1,850,000. The Commission points out that if the present inadequate balance in the reserve for depreciation is not to be considered as a controlling factor in the solution of the problem, the same inadequacy existed in petitioner's retirement reserve account under the system of accounting in effect prior to January 1, 1938. In fact at no time since 1926 has there been a balance in petitioner's retirement reserve sufficient to meet the retirement of the capital values in question. Moreover, it is not

known, or at least it has not been shown, when the property was retired. In violation of the accounting regulations existing at the time no entry was made by petitioner when the property was actually taken out of service. The Commission concludes that the amount erroneously charged to Account 105 should be charged to surplus. While there is a technical distinction between the retirement reserve account under the old system and a reserve for depreciation account under the new system, the determination of the Commission is not based primarily upon this distinction but upon the broader proposition that petitioner has never built up or maintained in either a retirement or depreciation account an adequate reserve to meet the retirements in question, and hence the proper place for them to be entered is in the surplus account.

Petitioner asserts that this direction on the part of the Commission violates the principle of uniform accounting in that it will require petitioner to keep its books on one basis, whereas other gas corporations which have been confronted with similar situations will be permitted and ordered to keep their accounts on another and different basis. This argument is entirely speculative. There is no proof of similar situations or that the Commission would not meet them in the same manner. Petitioner quotes from the provisions of the former accounting system which required a utility to deduct capital retirements from capital accounts and charge the same to retirement reserve, and if the total balance of the retirement reserve account was not sufficient to cover all such retirements, then the balance remaining was to be charged to some other appropriate account. The conclusion which petitioner wishes drawn from these provisions in the former system is not clear, but apparently it is that because of them the Commission must now charge retirement losses to an account in the new system known as reserve for depreciation. Petitioner, however, is in no position to claim the enforcement of a former system for it did not comply with its requirements, and in violation thereof retained the items in question in its capital accounts. Moreover, there is a difference, as stated before, between the former retirement reserve account and the new reserve for depreciation account. The former did not relate to all of the property of the utility but only to the loss of that property which was actually retired, while the latter deals with the loss of value of all of the utility's existing property due to wear, obsolescence and other causes. Since it failed to charge off the actual retirements when they occurred, petitioner is in no position now to demand that the amount thereof should be charged to a reserve account created for an entirely different purpose. The problem presented is due entirely to petitioner's

own neglect, and while the Commission may not have power to compel petitioner to maintain an effective reserve we do not think that such lack of power bars its determination as an accounting proposition under the circumstances disclosed. For the purposes of adequate regulation there must be some elasticity in the application of uniform accounts.

There remains the determination of the Commission with respect to the Phillips fee. This was paid by petitioner to E. L. Phillips & Co., Inc., under a contract made in 1927, and apparently carried through until 1933, by the terms of which the Phillips Company was to do engineering and construction work for petitioner on the basis of cost, including overhead expense, plus a fee of five per cent. In so far as the work related to this item is concerned the Commission has allowed as a part of the original cost of plant structure the amount paid for labor and materials plus the burden, but has rejected the fee as not a part of the reasonable cost of the property. This determination is based, in part at least, upon the relationship which existed between the two organizations, and some historical background is, therefore, necessary to appraise the validity of the rejection.

The E. L. Phillips Company was organized in 1905 under a trade name, and subsequently was incorporated in 1911. For many years up to 1933 it did a great deal of engineering and construction work for the Long Island Lighting Company and its subsidiaries on a cost plus basis. The Long Island Lighting Company was organized in 1911 also, and afterwards acquired other utility corporations. For the period with which we are chiefly concerned, viz., from 1927 to 1933, Mr. Phillips practically owned and certainly controlled the E. L. Phillips Company, He was also one of the organizers and a dominant figure in the Long Island Lighting Company, in fact he was the president of the company during the period mentioned. Petitioner is a part of the Long Island Lighting Company's system of utility corporations. It is owned and controlled by the Queens Borough Gas and Electric Company, which in turn is owned and controlled by the Long Island Lighting Company. Some exception is taken to these statements, but the Commission has so found, and there is ample evidence to support its findings in that regard.

The first engineering and construction contract between the Long Island Lighting Company and the E. L. Phillips Company was made in 1911, shortly after the incorporation of the two companies. From that time until 1933 there was a contract for similar services between these parties, and every time that a new utility was added to the Long Island system, a similar contract was made between

the newly acquired company and the E. L. Phillips Company. In accordance with this practice the contract involved here was made in 1927 when the common stock of petitioner was acquired by the Queens Borough Gas and Electric Company.

The term overhead expense was not precisely defined in the contract in question, but the ordinary interpretation of such a term would be the expense reasonably attributable to the work at hand. It is claimed that this burden, so called, was computed as follows: three per cent on material, five per cent on field labor and twenty per cent on New York office items. These percentages were first arrived at between the Long Island Lighting Company and the E. L. Phillips Company in March, 1924, and were thereafter applied in computing payments for overhead expense under all of the contracts with the Long Island Lighting Company and its subsidiaries. Other than opinion evidence no cogent proof was offered by petitioner to show that the applied percentages represented the real overhead expense fairly and reasonably attributable to the cost of performance by the E. L. Phillips Company.

The matter of fees paid to this company was the subject of an intensive investigation in a Long Island Lighting Company rate case. The same witness who prepared the accounting exhibits and testified in that case also testified in the present proceeding. For the sake of convenience his testimony in the former case was received by the Commission in this proceeding, a practice permissible in proceedings before the Commission, for the latter is not bound by technical rules of evidence. (Pub. Serv. Law, § 20.) Petitioner was given the right to cross-examine this witness as to his former testimony but refused to exercise it. It was shown by testimony in the rate case that the overhead expense paid to the Phillips Company contained many items wholly personal to Mr. Phillips. It was also shown that on an original cash investment of $50,000 the common stockholders of this company received $1,575,201 in the form of dividends over a twenty-one-year period, or over 3,000 per cent; and that seventy-five per cent of these earnings were from construction activities, including those under the Long Island Lighting system contracts. The Commission quite evidently concluded that in view of such enormous profits there was a large amount of indeterminate profit concealed under the guise of overhead charges. It held that the fee charged and collected by the Phillips Company was not a reasonable part of the cost of construction, and it probably would have been justified in rejecting a part, at least, of the burden percentages in view of the proof in that case. It said, however, in that connection: " Notwithstanding the doubt as to the reasonableness of

the construction cost of certain parts of the property and of the propriety of certain expenditures used to justify the burden percentage, the cost of the work done by E. L. Phillips & Co. will be accepted at the amount paid to E. L. Phillips & Co. for labor and materials and the burden computed thereon.'' On review in this court that determination was confirmed on the ground that the issue presented was one of fact and the determination had ample evidence to sustain it. (249 App. Div. 918.)

There is no impelling reason to reach a different conclusion here. Obviously the Phillips Company and petitioner were not dealing at arm's length. The latter was under the ultimate control of the Long Island Lighting Company and Mr. Phillips was the president and a director of that corporation, besides owning and controlling a substantial block of its stock. He was also the president and a director of the E. L. Phillips Company, and controlled all of its stock. Both of these corporations occupied common offices, and had many common employees receiving compensation from both companies. The lighting company frequently supplied the construction company with funds in advance of the billing for work performed for itself and its subsidiaries. The Commission found that the Phillips Company was practically the construction department of the Long Island system. Certainly if that company and petitioner were not affiliates of the Long Island system in the strict sense of the term they occupied positions so closely analogous that any attempt to find a practical distinction would be fruitless. Under the circumstances the Commission not only had the right but the duty to scrutinize their transactions closely. (Pub. Serv. Law, § 66, subd. 9; *Matter of New York State Electric & Gas Corp.* v. *Public Service Commission,* 245 App. Div. 131; affd., 274 N. Y. 591; *America Telephone & Telegraph Co.* v. *United States,* 299 U. S. 232.) It had this power prior to and irrespective of the enactment of section 110 in the present statute, under which profits to an affiliate are now forbidden. Petitioner had the burden under the set-up disclosed to establish that the amounts paid to E. L. Phillips & Co. were fair and reasonable under all the circumstances. The Commission has found that it did not sustain this burden, and it found in addition that the cost of the work under the contract was unreasonably high so that the allowance of a fee in addition was not justified by the proof. These findings involve issues of fact, and there is in our opinion sufficient evidence to sustain them.

Beyond these findings the point seems to be made that the Commission had no power to direct the elimination of the fee in question from petitioner's fixed capital accounts, and to require

that the same be charged to surplus. In somewhat analogous situations such power has been recognized and upheld. (*Matter of New York State Electric & Gas Corp.* v. *Public Service Commission, supra; Matter of New York State Electric & Gas Corp.* v. *Maltbie,* 243 App. Div. 655.) The decisions quoted to establish a contrary conclusion do not, as we read them, rest upon any principle that a regulatory body empowered to prescribe a system of uniform accounts, to examine the same and direct appropriate entries therein, may not direct, as a result of evidence concerning specific transactions, that improper expenditures be written off. Indeed, they expressly recognize that one of the prime purposes of administrating a system of uniform accounts is to prevent padding by the entry of improper charges. (*Matter of New York Edison Co.* v. *Maltbie,* 244 App. Div. 685; affd., 271 N. Y. 103; *American Telephone & Telegraph Co.* v. *United States, supra.*) The recognition of this purpose is not inconsistent with the rule that the Commission cannot compel a utility to write off from its book values a loss which it has not sustained. The principles involved are quite different. One situation involves an improper charge and the other does not. Assuming that the Phillips fee was correctly found to be an improper charge then any argument that the Commission lacks power to direct its elimination must necessarily rest solely on the fact that it has been entered in a capital account and paid. If a limitation exists on any such basis as that then the power of the Commission to regulate is largely fictitious. With affiliates and interdependent utilities involved capital values might be loaded with improper expenditures and built up to any figure, however preposterous, and under such a theory the Commission would be powerless to interfere. We decline to accept such a theory, and in our opinion the Commission had authority under the statute to make the direction attacked.

The determination of the Commission as to Macdonald's organization fee of $25,000 should be annulled and the proceeding remitted in so far as this item is concerned. The Commission's determination as to the other items should be confirmed. Petitioner should have fifty dollars costs and disbursements.

BLISS and HEFFERNAN, JJ., concur; HILL, P. J., and CRAPSER, J., concur except as to the Phillips item of $9,706.31.

Determination of the Commission as to the Macdonald fee of $25,000 annulled on the law and the facts, and the proceeding, in so far as that item is concerned, is remitted for action in conformity with the opinion herein. We have considered the facts and find that there is no substantial evidence to sustain the con-

clusion of the Commission that this item was not a proper organization charge, and we find to the contrary that it was properly so classified.

Determination of the Commission directing a charge to surplus of items amounting to $33,532.16, and relating to property no longer in existence, is confirmed.

Determination concerning the so-called Phillips fee of $9,706.31 is confirmed.

Petitioner may have fifty dollars costs.