In the Matter of PAVILION NATURAL GAS COMPANY, Petitioner, against MILO R. MALTBIE et al., Individually and Constituting the Public Service Commission of the State of New York, et al., Respondents.

Third Department, December 29, 1944.

*Griggs, Baldwin & Baldwin,* attorneys (*Charles G. Blakeslee* of counsel), for petitioner.

*Philip Halpern,* counsel to the Public Service Commission, attorney (*Laurence J. Olmsted* of counsel), for respondents.

FOSTER, J.  We are asked to review, pursuant to article 78 of the Civil Practice Act, certain orders of the Public Service

Commission relative to the accounts of petitioner, The Pavilion Natural Gas Company. Petitioner is a public utility gas corporation subject to the jurisdiction of the Commission, and the latter on its own motion instituted in February, 1938, an investigation of petitioner's accounts and records, and as to the original cost of petitioner's property and the depreciation thereof. After the conclusion of the first set of hearings a report was made by the hearing Commissioner, and thereafter the proceeding was reopened on the request of petitioner and additional hearings were held. Orders were then made directing petitioner to make certain specified entries on its books of account. The entries in controversy are these:

(1) Purchase of Pittsburgh Gas & Oil Company in 1915. Petitioner has been directed to write off the sum of $93,016.80 by charging the same to earned surplus. Petitioner contends that this amount should be charged against its depreciation reserve account on the ground that full and proper reserves for depreciation of the property were duly set aside for this purpose.

(2) Loss on the construction of the Newfield line amounting to $29,009.79 which petitioner has been ordered to charge to earned surplus. Petitioner contends also that this amount should be charged to its depreciation reserve account, because surplus for the depreciation of this property had also been duly set aside.

(3) A construction fee of $50,412 to Stemmler & Company. Petitioner was directed to eliminate this amount from its property accounts and charge the same to earned surplus on the ground that there was no proof in the case that petitioner received any services for the Stemmler fee, other than services for which it had already paid, as a part of the cost of work under contract, or as salaries to its own officers and employees. Petitioner contends that this amount is proper in that it covered necessary engineering services in connection with the construction of a new gas plant and also on the ground that the expenditure was approved by the Commission in 1928.

(4) Transfer of $196,159.62 surplus to depreciation reserve. This transfer was directed upon the ground that petitioner had previously transferred in 1926, in violation of the system of accounts then in vogue, this amount from its retirement reserve account to its surplus account. Petitioner contends that this original transfer was proper because its depreciation reserve at the time was excessive, and that such fact was recognized by the Commission, and also that there is no finding as to the

amount of the proper depreciation for reserve at the time of the transfer.

These items will be discussed in the order mentioned.

In 1915 upon the joint application of the Pittsburgh Gas & Oil Company and petitioner, the Public Service Commission granted permission to petitioner to purchase for the sum of $200,000 in cash all the rights, privileges, franchises and property of the Pittsburgh Company. The order for the transfer provided that payment of the purchase price should not be made by petitioner until a written instrument of transfer had been executed and delivered. No such instrument was executed but all of the outstanding stock of the Pittsburgh Company was properly transferred to petitioner, and hence, of necessity a transfer of all of the vendor's property followed as a matter of course. The permission order also provided: " Nothing herein contained shall be deemed or construed as controlling the action of this Commission in any capitalization or rate proceeding which may hereafter be brought by the Pavilion Natural Gas Company or its successors." Petitioner was thus placed on notice, if any notice was necessary, that the Commission's approval of the transaction did not necessarily mean its acceptance with finality for capitalization purposes of the face value of the figures involved.

The two companies were closely affiliated, so closely in fact that the petition seeking approval of the transaction was executed for both companies by the same individual, and the petition itself contained the statement that the capital stock of both corporations was owned substantially by the same people. These companies were also closely affiliated to the corporation known as the Independent Natural Gas Company. This company owned all of the stock of petitioner at the time, and in addition practically all of its stockholders were also stockholders of the Pittsburgh Company. No cash was paid by petitioner to the Pittsburgh Company because apparently on account of the interlocking interests no payment was required except a small payment to the minority stockholders of the Pittsburgh Company, and apparently whatever cash was needed for this purpose was furnished by the Independent Natural Gas Company. After the transaction petitioner entered upon its books a journal entry which debited $200,000 to an asset account called " Pittsburgh Gas & Oil Company ", and credited bills payable with a like amount. It is assumed, and there appears no other plausible explanation, that the latter entry was on account of petitioner's obligation to the Independent Natural

Gas Company, the parent corporation. After the original debit entry of $200,000, the amount was broken down on petitioner's books as follows:

Land ................................. $190,862.98
Mains ................................ 600.00
Accessory Works Equip................. 8,537.02

Subsequently the Independent Natural Gas Company merged its accounts with those of petitioner. The latter's liabilities to the parent corporation were canceled, and petitioner's surplus was credited with $200,000. We take this to mean that by the cancelation of the $200,000 intercompany debt an alleged capital surplus for petitioner in that amount was created. Still later, in 1926, when control of petitioner passed to the Genesee Valley Gas Company the liabilities of Independent were again canceled, for reasons not apparent, but the $200,000 item remained in petitioner's surplus. It does not seem to be disputed that the actual cost of the physical property acquired from the Pittsburgh Company was only $38,247.89, despite the figures heretofore noted. Thus the petitioner, as a result of this inter-filiate transaction, entered on its books as an asset a write-up of $161,752.11, i.e., the difference between $200,000 and the $38,247.89. It is conceded that this excess over cost value did not and does not now represent any property used or useful in the public service. The president of petitioner claimed that it represented the cost of creating the company and what it actually paid out for this purpose in excess of physical value, and it was his belief that this intangible value will remain as long as the business continues and prospers.

Petitioner originally claimed that this balance should be placed in the miscellaneous intangible account as part of its fixed capital. The hearing Commissioner rejected this claim at the conclusion of the first set of hearings and recommended that this balance be charged to petitioner's surplus account. The case was then reopened upon petitioner's application and a new proposal was made. Petitioner abandoned the theory that the balance of $161,752.11 should be carried as an intangible asset in its capital accounts, and advanced the claim that it should be charged to petitioner's depreciation reserve. Petitioner alleged support for this claim on the ground that the entire balance had been amortized by accruals to three differently labeled accounts, but all set up for substantially the same purpose of creating a reserve, during the period which elapsed between the date of purchase and the date of the examination. The first account was known as "Accrued Amortization of

Fixed Capital Reserve ", in effect until July 1, 1924, which became thereafter " Retirement Reserve ", in effect until January 31, 1938, which became thereafter " Depreciation Reserve ".

In support of its new contention petitioner offered proof that in the year 1916 15% of the total price for the Pittsburgh property, or $30,000, was charged to amortization or depreciation of that property and credited to amortization reserve. During the years 1918 to 1920 inclusive no accruals or amortization were made. During the years 1921 to 1925 annual accruals were made for this purpose on the basis of 5% of petitioner's fixed capital upon all property installed after December 31, 1908. The $200,000 Pittsburgh purchase was included in the fixed capital or base upon which the 5% annual accrual was computed, and the same method was employed for the first eight and a half months of the year 1926. Thus, petitioner asserted that from 1916 to 1926 it had set up $84,988 45 in its reserve to take care of depreciation on the Pittsburgh transaction. During the latter part of 1926 and during the years from 1927 to 1941 petitioner adopted a different method of computing accruals to reserve and computed them on a basis of a percentage of revenues; that is, it allocated a fixed percentage of its gross revenues for such purpose. Petitioner computed these accruals for that period as amounting to $29,920. The Commission declined to accept this amount as representing proper accruals to depreciation during that period on the ground that they were based upon a percentage of revenues and as such could only be made for the purpose of retirement of petitioner's property and not for the purpose of absorbing improper items from capital accounts. It is pointed out that when accruals are based on revenues " any attempt to allocate a portion of the reserve to a particular piece of property is highly conjectural." Obviously under this method the accruals based on a percentage of gross revenues would have been the same whether or not the Pittsburgh property was included in fixed capital. It was also pointed out that petitioner failed to show that accruals from 1927 to 1941 were adequate not only for depreciation on its tangible operating property but also sufficient to provide for the retirement of the excessive book balance resulting from the Pittsburgh transaction.

The Commission, however, did accept petitioner's computation of $84,988.45 as representing accruals during the period from 1916 to 1926 as applicable to the Pittsburgh property.

But as applied to the transaction it distinguished between accruals which it held should relate to the cost of the physical property, that is, $38,247.89, and those which should relate to the excessive book balance of $161,752.11. In determining the amount of accruals applicable to each element it followed the method of computation used by the company and on that basis found that $16,253.14 out of the accepted figure of $84,988.45 would be consumed in the retirement of the physical property actually acquired. It held therefore that this amount could not be set up in the depreciation reserve as an offset against the excess book balance. The difference between these two figures of $68,735.31, however, could be used for such purpose. The Commission therefore modified the decision originally proposed of charging the whole excess of $161,752.11 to surplus by deducting the sum of $68,735.31 therefrom and directing that the balance of $93,016.80 be charged to surplus.

We cannot say that the decision of the Commission as to this item was arbitrary or without support in the evidence. The Commission had full power to supervise the accounts of petitioner, and moreover the burden of proof was on the latter to establish the correctness of its own accounts. (Public Service Law, § 66, subd. 9.) Petitioner's complaint is based largely on the assertion that it complied with all the requirements of the different accounting systems promulgated by the Commission during the period covered, and that it is now being penalized because its passing judgment as to detailed rules of procedure respecting amortization and other aspects of accounting does not now coincide with the after judgment of the Commission. However the crux of the situation as it appears to us lies in the fact that petitioner created a fictitious surplus of $161,752.11, a surplus that had no real existence in fact, and that out of this inflationary bookkeeping, plus a failure to set up adequate accruals against it, all the difficulties with respect to this item have arisen. A part of this amount has been taken care of by accruals to offset it in the amount of $68,735.31, but the balance of $93,016.80 is still fictitious if viewed in the light of what a surplus should really represent. This balance represents no capital outlay in any real sense and to permit it to remain as a capital asset would provide a distorted picture of petitioner's financial structure. Petitioner apparently recognized this when it changed its proposal to have this balance placed in its miscellaneous intangible account, as a part of its fixed capital, to its last proposal to have it placed in its depreciation reserve. Before permitting it to be placed in the last-mentioned account

the Commission was justified in requiring clear proof that sufficient accruals to the reserve, directly applicable to this specified amount, and sufficient to offset it, had been set up. Petitioner, we believe, failed to sustain its burden of proof in that regard and under the circumstances the decision of the Commission directing that it be charged to surplus was neither arbitrary nor capricious.

In 1922 petitioner applied to the Commission for permission to construct a gas transmission line, under the terms of an agreement with the Newfield Company, for the purpose of obtaining an additional supply of gas from the latter. There is evidence that the application was made under pressure from a member of the Commission, and as it turned out the venture was an improvident one, but these facts cannot be held to have any effect on proper accounting methods applicable to the transaction.

Petitioner was to construct the line and hold title thereto until 50% of the cost of construction had been paid by the Newfield Company in the form of rebates on gas purchased, and then title was to be transferred to the Newfield Company. The cost of the line was $64,626.87. The gas supply thus tapped failed in 1925 before title to the line had been transferred. Petitioner salvaged the cost of the line in part, some of the pipe being taken up and used elsewhere, and some being used in place with other lines. Petitioner sustained a loss of $27,324.64, the difference between the cost of construction and the total amount of payments received from the Newfield Company plus the cost of the pipe salvaged. Petitioner charged this loss off by debits to the retirement reserve in the years 1930 and 1931.

This charge of the loss to the retirement reserve was held by the Commission to be improper on the ground that the entire transaction had nothing whatever to do with such reserve. It was pointed out that no part of the loss could properly have been charged to the reserve if title had been transferred to the Newfield Company under the terms of the agreement. In addition the transaction was not carried as a part of plant accounts but in an account for miscellaneous investments, and hence no accruals were applicable to the Newfield line. In view of this the Commission has determined that petitioner's proposal to charge the loss to depreciation reserve would not constitute proper accounting, and that the loss should be charged to surplus. Viewed as an accounting proposition we cannot say that this determination is unreasonable and not sustained by the evidence in the record. It is suggested that the loss might have

been handled in a different manner. Perhaps the line might have been set up as a part of petitioner's depreciable property and accruals made thereon as a part of its operating expenses. Then there would have been accruals in the reserve against which a loss could have been taken. But this was not done, and the transaction must be viewed now as it was actually handled and not from the viewpoint of what might have been done. The reserve for depreciation account is not an odd lot corner to which every loss may be thrown, irrespective of its source, but a reserve set up solely for the purpose of providing for depreciation of a physical plant in public service. (*Matter of Long Beach Gas Co., Inc.,* v. *Maltbie,* 264 App. Div. 496, affd. 290 N. Y. 572.) It may be said, however, that the charge of this loss against the surplus account now does not reduce such account to any greater extent than it would have been reduced if the transaction had been handled as depreciable property or if the loss had been amortized as a part of operating expenses.

In 1926 the Genesee Valley Gas Company acquired all of petitioner's capital stock. T. W. Stemmler was the president of the Genesee Company and he became president of petitioner. He was also president of Stemmler & Company, an engineering and construction company, and one of the companies which controlled the Genesee Valley Gas Company. In October, 1926, petitioner entered into a contract with Stemmler & Company under which the latter agreed to supervise all of petitioner's construction work for a fee of 12½% of the cost of the work. The cost, as defined, included subcontracts, materials, machinery, equipment, labor, lands or rights of way, and in addition and quite significantly, the salaries of engineers and a superintendent of construction from the Stemmler Company. An artificial gas plant was constructed under this agreement for petitioner sometime between 1926 and 1928, and during that period petitioner paid to Stemmler & Company a fee of $50,412.77, which represented 12½% of the cost of the work done on the gas plant, under the provisions of the contract. This fee was included in petitioner's property accounts as a part of the original cost of the plant. The Commission held that such fee, exacted from an affiliated company by Stemmler & Company, which at the time had petitioner under its complete domination and control, required justification, and that since no evidence was offered as to the propriety or reasonableness of the charge it was manifestly improper to permit same to remain in petitioner's capital accounts. A rather feeble defense to

sustain the propriety of the charge was offered on the theory that there was need for engineering services in connection with the construction of the plant, but the answer to this argument is that petitioner paid for all engineering services as a part of the cost of the work. In view of the intercompany relations the burden rested on petitioner to establish clearly that the fee was reasonably necessary and proper, and since there is no evidence whatever to sustain it the Commission was clearly justified in refusing to permit the charge to remain as a part of fixed capital, and to direct that it should be charged to surplus. (*Matter of Long Beach Gas Co., Inc.,* v. *Maltbie, supra.*)

When the Genesee Valley Gas Company took over control of petitioner in 1926 there was on petitioner's books a retirement reserve in the amount of $477,581.59. The new management decided on the basis of its own theoretical computations that $281,421.97 was a sufficient reserve and that the balance of $196,159.62 represented an excess over an adequate reserve, and thereupon it proceeded to transfer the alleged excess from the retirement reserve to its surplus account. Permission for this transfer was not obtained from the Commission, and the transaction apparently was in violation of the uniform system of accounts then in vogue. Such system then provided: " No portion of the amount reserved for retirement shall be diverted to Surplus, or other use made thereof, except as above provided, without the approval of the Commission " (account 251 retirement reserve). The transfer in question was not within the exception in the sentence quoted and hence the permission of the Commission was necessary to properly effectuate it. The same restriction has been carried over to the present system of accounts now required (account 250 reserve for depreciation). The foregoing transfer was discovered in December, 1927, and the company was notified by letter that it violated the system of accounts. Apparently petitioner took no action thereon. It is urged as a defense that the Commission authorized the issuance of securities after it knew of the transfer. We know of no authority, applied to like circumstances, which holds that a grant of authority to issue securities, especially to an affiliate, constitutes a blank certification of the correctness of a utility's capital accounts. The Commission has ordered the company to reverse the transfer and to restore the sum of $196,159.62 to the depreciation reserve.

There is no explanation in the record for failure to obtain permission of the Commission before the transfer was made but it is asserted that the reserve as of December, 1926, was in

fact in excess of the required amount and that the Commission ought now to give its approval of the transfer as of that date. This, of course, is merely an appeal to the discretion of the Commission and on such an application the order of the Commission will not be interfered with unless there is clear proof that there was an abuse of discretion. We find no such proof in the record. The proof does not reveal that the reserve as of December, 1926, was in fact excessive. Against the $477,581.59 in the retirement reserve there were several large amounts which should have been recorded as of.that time. Included among these is an undisputed item of $20,302.47 for retirements of physical property acquired from the Pittsburgh Company, which the company had failed to record, an item in the amount of $68,735.31 on account of part of the inflationary element in the Pittsburgh transaction which is to be charged to the depreciation reserve in accordance with the petitioner's request, and unrecorded retirements of property other than the Pittsburgh property, amounting to $119,283.46. If these items were charged against the amount then in the retirement reserve the balance would have been less than the sum of $281,421.97, which was the amount arrived at by theoretical computations as an adequate and proper reserve requirement.

In the light of these facts we cannot say on a review of this character that petitioner sustained the burden of establishing that the depreciation reserve was excessive at the time of the transfer. Moreover if petitioner's claim is to be treated as an application for approval *nunc pro tunc* then it also had the burden to establish the adequacy of its depreciation reserve as of the date of the Commission's examination. No proof was offered on the latter phase of the matter.

The order and determination of the Commission as to each of the foregoing items should be confirmed, with fifty dollars costs.

All concur, except HILL, P. J., who dissents.

Order and determination of the Public Service Commission confirmed, with fifty dollars costs.