In the Matter of REPUBLIC LIGHT, HEAT AND POWER CO., INC., Petitioner, against MILO R. MALTBIE et al., Constituting the Public Service Commission of the State of New York, et al., Respondents.

Third Department, January 7, 1948.

*Raichle, Tucker & Moore,* attorneys (*Frank G. Raichle* and *John Howell* of counsel), for petitioner.

*Philip Halpern,* counsel to Public Service Commission (*George H. Kenny* of counsel), for respondents.

FOSTER, J. Petitioner is a public utility corporation, engaged in the business of selling natural and artificial gas to the public in an area of western New York. It has brought this proceeding, under article 78 of the Civil Practice Act, to review certain accounting determinations contained in an order of the Public Service Commission. Under the authority conferred by section 66 of the Public Service Law the Commission adopted an order prescribing a uniform system of accounts, effective as of January 1, 1938, applicable to gas corporations. The determinations to be reviewed were made by the Commission in the application of this system of accounts to the affairs of petitioner.

Petitioner is a subsidiary of the Cities Service System. It was organized on July 31, 1918, for the purpose of consolidating properties of several gas companies whose capital stock had been acquired by the Cities Service System. The stock of those companies was first acquired in 1917 by the Frost Gas Company, also a subsidiary of Cities Service and later to become the Northwestern Gas Company. As of October 31, 1918, the properties and franchises of those companies were transferred to petitioner, and it was authorized to issue capital stock in payment therefor. At the same time the Frost Gas Company was authorized to acquire and hold the capital stock of petitioner. Those transactions resulted in the acquisition and consolidation of nine companies. Later petitioner purchased the gas plant properties of several other companies either by the issuance of stock or for cash. All transfers and

the issuance of stock in connection therewith were permitted and approved by the Commission in proceedings brought for that purpose. Proceedings relative to the consolidation of the first nine constituent companies were put through in the years 1917 and 1918.

The effect of those proceedings is a matter in dispute. Petitioner argues that actual costs of the properties to the predecessor companies were determined in those proceedings. That such costs, less some deductions, it was permitted to pay and enter upon its books as capital items; and further, upon the basis of such costs it was permitted to issue its securities. It follows, so petitioner avers, that the actual costs paid to its predecessors became its original costs, and the Commission is without power to alter this fundamental situation and impair its capital accounts by some later definition of original cost. The Commission takes the position that the only issue involved in the 1917 and 1918 proceedings was whether the stock acquisition and transfers of properties were in the public interest. That the journal entries directed to be made by the constituent companies were not based upon any finding as to the cost of the properties to them, but simply to fix the purchase price to be paid by petitioner. This explanation seems somewhat inconclusive. We should think that a determination of whether the transfers were in the public interest would have required the Commission to ascertain the cost to the constituent companies before it could determine whether petitioner was to pay a fair price. However that may be, and however important an exploration of these matters may become in the future, any further consideration of them at present is premature, as we shall indicate hereafter.

The proceeding under review is a general accounting proceeding, initiated by the Commission as we have said for the purpose of bringing petitioner's accounts into conformity with the uniform system of accounts adopted in 1938. There can be no question of the Commission's power to prescribe a uniform system of accounts and to compel utilities to conform providing that the system adopted does not require that capital items be charged to surplus irrespective of whether they represent genuine or false values, and does not require a utility to write off a loss it has not sustained (*Matter of New York Edison Co.* v. *Maltbie,* 244 App. Div. 685, affd. 271 N. Y. 103; *People ex rel. Iroquois Gas Corp.* v. *Public Service Commission,* 264 N. Y. 17). The issues under review must be determined in accordance with these basic concepts of the Commission's power.

For the purposes of this opinion the disputed items of account may be classified as follows:

(a) Items shifted from one asset account to another, chiefly from an account known as Account 101 — Gas Plant in Service — to an account known as Account 105 — Gas Plant Acquisition Adjustments, totalling the sum of $1,243,547.96.

(b) Items amounting to $243,123.94, which the Commission has refused to permit petitioner to add to its capital accounts on the ground that the amounts involved were previously charged to operating expenses.

(c) The sum of $3,869, percentage overheads which the Commission has refused to permit petitioner to add to its capital accounts.

(d) The sum of $4,872.10 representing a share of cost incurred by Henry L. Doherty & Co. for a natural gas survey of the United States and charged by petitioner to its capital accounts, which the Commission has directed petitioner to charge to surplus.

(e) The reversal of an entry by which petitioner transferred to surplus from its depreciation reserve account the sum of $400,000 without the consent of the Commission.

Under the 1938 system of accounts Account 101 is designed to include only items reflecting the original cost of property used and useful in the public service, and original cost is defined in the same system as the cost of property to the person first devoting it to the public service. Account 105, quite differently, is intended to include the difference, if any, between such original cost and the actual cost to the accounting utility. It will be noted that all of the items classified as (a) in this opinion have been directed to be placed in this account.

Petitioner attacks the validity of this cost splitting accounting requirement, alleging that it amounts to confiscation. Inherent in its argument is the theory that the Commission will in the future require it to charge off to surplus some of its actual costs that it has been directed to place in Account 105. It cites in part a report of the Commission made in 1939 in support of its theory that the Commission is committed to such a policy. Without attempting to determine whether the full text of the report justifies this conclusion suffice it to say that an ex parte report of this character presents nothing for judicial review. We are limited to a review of determinations arrived at in a quasi-judicial proceeding.

We find nothing in the 1938 system of accounts in the nature of an inflexible requirement that items placed in Account 105

be written off out of surplus irrespective of whether they represent genuine costs arrived at between those who are not affiliates. If such a requirement existed petitioner would have an impregnable argument, for under the cases cited a utility cannot be compelled to write off a loss it has not sustained. But the record does not indicate that such a condition exists. Both accounts, 101 and 105, are asset accounts. It is true that Account 105 is somewhat in the nature of a suspense account in that some items placed therein may be subject to future investigation, but this characteristic alone does not condemn it. We cannot assume for the purposes of this review that the Commission will in the future improperly require petitioner to charge off to surplus items of actual cost that may be placed in this account. If such action should be taken in the future petitioner will then have the right to review the determination of the Commission. For the present at least petitioner's complaint that the cost splitting accounting requirement is confiscatory is wholly premature. The desideratum for such a requirement is not before us. Doubtless it might be plausibly argued that if actual costs incurred in a bona fide transaction may not be required to be charged off then the distinction between original cost and the actual cost to the accounting utility is of small moment. But such considerations were for the Commission in formulating a system of accounts for regulatory purposes and not for us to pass upon.

On the basis that this requirement is not per se illegal we reach the query of why the Commission refused to find the well-drilling costs of the predecessor companies, included under (a) of our classification, as original costs. There is no dispute about the sums paid by those companies for drilling wells, those which were productive and those which became dry holes. The Commission has recognized the fact that the properties purchased by petitioner included these costs and has permitted it to retain the amounts as plant capital in Account 105, but has determined that such costs did not properly belong in Account 101. The reason for that determination lies in the fact that the predecessor companies never capitalized the bulk of these costs in the first instance and charged them to operating expenses. Petitioner failed to show the capitalization of any part of this amount, although afforded the opportunity to do so, and hence the Commission was justified in finding that the whole amount was charged to operating expenses. It was perfectly proper under the accounting practice then in vogue to charge such costs either to capital or to operating expenses but of

course it could not be done both ways. The Commission has held that these costs, having been charged to expenses as a matter of deliberate and informed choice, may not now be placed in Account 101 as original costs. There is substantial evidence in the record to sustain this determination as a matter of good accounting, and legal authority as well (*Colorado Interstate Gas Co.* v. *Federal Power Comm.*, 142 F. 2d 943, affd. 324 U. S. 581). The decision of this court in the case of the *Matter of Village of Wellsville* v. *Maltbie* (257 App. Div. 746) held nothing to the contrary. There the court found on the record then before it an error in the method of accounting adopted, not a deliberate and informed choice as to one of two permissible methods.

In this discussion we have made no distinction as to the costs of producing wells and dry holes to the predecessor companies because both were charged to operating expenses. There is an additional reason for placing the cost of dry holes in Account 105. Under Account 101 only the cost of gas wells in service may be entered. This of course applies also to the cost of dry holes drilled by petitioner itself.

Aside from the costs of drilling wells the Commission has directed the sum of $436,384.79 included in (a), relating to so-called "intangibles" to be entered in Account 105. These items were carried over from the books of the predecessor companies upon consolidation. Precisely what they represent is by no means clear. Petitioner says that they represent moneys actually spent by the predecessor companies in getting started and becoming going utility concerns. It claims that these items should be entered under the 1938 system of accounts in subaccount 303 — Miscellaneous Intangible Plant — of Account 101, and that to place it in Account 105 will be tantamount to confiscation. As heretofore pointed out this conclusion is entirely premature. We do not find it necessary to trace the history of previous intangible gas capital accounts in former accounting systems to determine whether the present subaccount 303 is their lineal descendant. So far as we can discover there is no proof in the record that any of these so-called intangibles represent the cost of any property first devoted to the public service so as to come within Account 101. The most that can be said is that they represent a part of the actual or book cost to petitioner in contrast to original cost as defined in the 1938 system. Although not shown to constitute original cost, since they are a part of the purchase price paid by petitioner the Commission has directed their inclusion in Account 105, which, to repeat, is an asset account. Nothing has

been charged off and petitioner's capital rights as to this item have not therefore been impaired.

As a part also of class (a) there is the sum of $110,845.30 for engineering fees and construction charges paid by petitioner to companies said to be affiliates, and entered in its capital accounts. The Commission has directed that this amount be entered in Account 105, but beyond this the Commission has made no order. The item remains for future investigation. The amount involved was paid to Henry L. Doherty & Company and the Lakeside Construction Company, $76,094.89 to the former and $34,750.41 to the latter. There was evidence of a close affiliation between these parties and petitioner, or the ultimate owner of petitioner's stock. This evidence coupled with the lack of competent evidence as to the services alleged to have been rendered was ample justification for the Commission to direct a segregation of these amounts in Account 105, subject to further investigation. If the creditor companies are found to be affiliates the burden of establishing the reasonable cost to them of whatever services they may have performed would be upon petitioner (*Matter of Pavilion Natural Gas Co.* v. *Maltbie,* 268 App. Div. 610, affd. 295 N. Y. 728; *Matter of Long Beach Gas Co.* v. *Maltbie,* 264 App. Div. 496, affd. 290 N. Y. 572; Public Service Law, § 110, subd. 3).

Item (b) of the classification used in this opinion embraces the sum of $243,123.94 which the Commission has refused to permit petitioner to add to its capital accounts (we have excluded overheads directed to be placed in Account 105). This sum embraces general and administrative expenses which petitioner had previously charged to operating expenses in past years, from 1919 to 1938. The formula by which petitioner has computed these alleged overheads is roughly that it costs as much to administer and supervise a dollar's worth of construction as it does to regulate and manage a dollar's worth of operation. Whether this formula is entitled to conclusive weight we need not consider. Nor do we need to consider whether time studies and records are essential for the computation of overheads if the latter are to be considered as fixed capital. The controlling point so far as this review is concerned is that petitioner may not reaccount and capitalize overheads that it elected through the years to charge to current operating expenses. There is substantial evidence in the record to the effect that such a procedure would constitute improper accounting for the reason that petitioner has charged rates during the years affected upon a basis which included these

overheads as a part of operating expenses. It cannot have the benefits both ways. We have considered before the impropriety of reaccounting in respect to well drilling costs which had also been charged to operating expenses. We reiterate that the *Wellsville* case (*supra*), is not an authority for such a practice where a deliberate and informed choice was made not to capitalize overheads and to charge them to operating expenses.

Item (c) involved the sum of $3,869.88 in alleged overheads which the Commission refused to permit petitioner to add to its capital accounts. One of the properties acquired by petitioner included certain uninventoried mains. Their estimated original cost was fixed at $27,597.42 and placed in petitioner's plant account. Petitioner sought to capitalize an additional amount computed at the arbitrary percentage of 14% of such estimated cost for overheads. There is no evidence in the record to show that the estimated cost did not include all items of cost.

Item (d) is self explanatory. The Commission directed a charge off to surplus of $4,872.10, which sum was a part of the cost of a gas survey of the United States made by Henry L. Doherty Company in 1942 for the Cities Service System, the entire cost of which was prorated among the companies of the Cities Service System. Petitioner charged its share to its capital accounts as overhead. It was not a proper capital expense to petitioner, and the Commission had the authority to direct that it be charged to surplus.

Item (e) deals with the reversal of an entry on petitioner's books transferring from its depreciation reserve to surplus the sum of $400,000 without the consent of the Commission. The necessity for such consent is not an open question (*Pavilion Natural Gas Co.* v. *Maltbie, supra*). It rests upon the proposition that after accruals have been made by a utility to a reserve for a specific purpose they may not be transferred to surplus without the Commission's approval. Here the Commission has merely directed a return to the depreciation reserve of the amount improperly transferred. It has determined nothing else with relation to the petitioner's depreciation reserve.

The determination and order of the Commission should be confirmed, with $50 costs.

HILL, P. J. (dissenting in part). The Commission's account 105 " Gas Plant Acquisition adjustments " is described by the Commission as an account of book assets which are not real assets. A transfer from Accounts 101–104 to Account 105 is

the first half of the present method which the Commission adopts in charging off assets. The Commission has directed that seven items aggregating more than $1,200,000 be transferred to Account 105 " unreal assets ". Such items now appear in the accounts devoted to " real assets ". These transfers are comparable, under the definitions furnished by the Commission, with elimination. The Commission may not require a utility to show a loss where none has occurred.

The Commission directs that $243,123.94 administration expenses be eliminated from capital assets. It permits a comparable charge for the years 1928 to 1933 of about $75,000 to remain in Account 101. The authorities in this State have determined that the expenses incident to converting the " bare bones " of a utility into a going, profitable business may be capitalized. The Commission's order in this regard should be annulled.

In 1926 petitioner transferred $400,000 from replacement reserve or depreciation surplus to the general surplus account of the company, where it has remained for more than twenty years. In 1938, an investigation of the accounts of the petitioner was made by the Commission and this transfer is mentioned in the report. The authorities seem to give to the utility management the right to determine the amount to be set aside for depreciation. However, under the rules of the Commission, a transfer of this kind can only be made with the approval of the Commission, and although twenty years have passed and equity would suggest otherwise, the rules should be followed, and the directed retransfer should be made.

HEFFERNAN, RUSSELL and DEYO, JJ., concur with FOSTER, J.; HILL, P. J., dissents, in part, in an opinion.

Determination and order of the Commission confirmed, with $50 costs.