17 N.Y.2d 373 (1966)
In the Matter of General Telephone Company of Upstate New York, Inc., Appellant,
v.
James A. Lundy et al., Constituting the Public Service Commission of the State of New York, Respondents.
Court of Appeals of the State of New York.
Argued February 16, 1966.
Decided June 2, 1966.
Everett I. Willis, Edward N. Sherry, William C. Sterling, Jr., John Robert Jones and Edward L. Wilkinson for appellant.
Kent H. Brown and Charles R. Gibson for respondents.
Chief Judge DESMOND and Judges SCILEPPI, BERGAN and KEATING concur with Judge FULD; Judge VAN VOORHIS dissents in an opinion in which Judge BURKE concurs.
*377 FULD, J.
The petitioner, a wholly owned subsidiary of General Telephone and Electronics Corporation (GT&E), provides telephone service to 13 counties in upstate New York. In January of 1963, it filed with the Public Service Commission certain proposals for rate increases. Following 12 days of hearings, the commission entered an order approving increases but for amounts considerably less than those sought. Insofar as relevant to the present controversy, the commission found that the petitioner was being overcharged for goods and services supplied by other wholly owned GT&E subsidiaries and that such *378 overcharges should be excluded from the petitioner's rate base and operating expenses.[1] The petitioner brought this article 78 proceeding  which was transferred from Special Term to the Appellate Division (CPLR 7804, subd. [g])  to set aside the commission's order. The Appellate Division unanimously confirmed the commission's determination and on this appeal, taken as of right on constitutional grounds (16 N Y 2d 617), it is urged that the commission should have credited the full amounts paid by the petitioner to its affiliated suppliers.
There can be no doubt that a regulatory body, such as the Public Service Commission, may review the operating expenses of a utility and thereby prevent unreasonable costs for materials and services from being passed on to rate payers. (See, e.g., Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U. S. 339.) When such materials and services are obtained through contracts which are the result of arm's-length bargaining in the open market, the contract price is usually accepted as the proper cost. However, when a utility and its suppliers are both owned and controlled by the same holding company, the safeguards provided by arm's-length bargaining are absent, and ever present is the danger that the utility will be charged exorbitant prices which will, by inclusion in its operating costs, become the predicate for excessive rates. Although the regulatory agency may, as indicated, review such charges in a rate proceeding, some state legislatures, as the Supreme Court of California pointed out, have not been satisfied with this indirect control of payments by a utility to its affiliate and have "enacted statutes specifically granting to their commissions power to regulate payments under such contracts" by requiring their submission to the commissions for prior approval (Pacific Tel. & Tel. Co. v. Public Utilities Comm., 34 Cal. 2d 822, 826; see, e.g., Ill. Ann. Stat., tit. 111 2/3, § 8a, subd. [3]; Rev. Code Wash. Ann., § 80.16.020; Wis. Stat. Ann. § 196.52, subd. [3].)
The New York Legislature did not go that far. Under our statutes, it is only an agreement between affiliates for "management, construction [or] engineering" services or for the "purchase *379 of electric energy and/or gas" which need be filed by a telephone company for commission approval. (Public Service Law, § 110, subds. 3, 4; see Matter of International Ry. Co. v. Public Serv. Comm., 264 App. Div. 506, affd. 289 N.Y. 830.) In every other instance, the commission is powerless to impair the obligation or otherwise invalidate a utility's contract (see, e.g., Columbus Gas Co. v. Comm., 292 U. S. 398, 400; Pacific Tel. & Tel. Co. v. Public Utilities Comm., 34 Cal. 2d 822, 828, 832, supra; New Jersey Bell Tel. Co. v. Board of Pub. Utility Comrs., 12 N. J. 568, 592), and the Legislature has specifically declined, on several occasions, to expand State regulation in this area so as to require that all contracts between utilities and their affiliates be filed for approval by the commission. The petitioner, relying on this legislative history, contends that the commission not only lacked but was purposefully deprived of the requisite statutory authority to investigate the prices charged by its affiliated suppliers.
With that contention we cannot agree. Despite the absence of an express grant of authority, the power to conduct such an inquiry and to ascertain whether the prices were excessive may be fairly implied from the rate-making powers already granted by the Legislature to the commission. In the past, the commission has supervised the accounting procedures used by utilities and directed that overcharges by affiliates be segregated in a special account. When this directive was reviewed and approved by the courts, it was assumed that, in some future rate proceeding, the overcharges would be excluded from the rate bases of the affected utilities. (See Matter of Pavilion Natural Gas Co. v. Maltbie, 295 N.Y. 728, affg. 268 App. Div. 610, 619-620; Matter of Long Beach Gas Co. v. Maltbie, 290 N.Y. 572, affg. 264 App. Div. 496, 504.) Such decisions point the result in the case before us.
The commission has been empowered to determine "just and reasonable" telephone rates (Public Service Law, § 91, subd. 1; § 97, subd. 1) and, as the United States Supreme Court noted many years ago, the rate-making power is not "subservient to the discretion of [a utility] which may, by exorbitant and unreasonable salaries, or in some other improper way, transfer its earnings into what it is pleased to call `operating expenses.'" (Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U. S. 339, 346, supra.) *380 Particularly when those expenses arise out of dealings between affiliates, the commission "not only [has] the right but the duty to scrutinize [such] transactions closely". (Matter of Long Beach Gas Co. v. Maltbie, 264 App. Div. 496, 504, affd. 290 N.Y. 572, supra.) And, in this connection, we find significance in the statutory requirement that the agency be given access to the records of all transactions between telephone companies and their affiliates (Public Service Law, § 110, subd. 2).
So far as rate making is concerned, it is of no consequence that the Legislature has declined to go further and provide for regulation by the commission of the very terms and conditions of all contracts between affiliates. The primary purpose of such regulation is to protect the corporation's treasury and to preserve its financial integrity. The function of the rate-making power, however, is to protect the utility's rate payers. In the proper exercise of that power, the commission does not require the authority to invalidate contracts. All that is required  and, indeed, all that is given  is the authority to disregard unwarranted payments to affiliates when calculating the "just and reasonable" rates which the telephone company will be permitted to charge to its subscribers.[2] The treatment thereby accorded to the affiliates' overcharges is no different than in any other case "where the commission and management disagree on the reasonableness of an expenditure, and the management concludes that it is good business judgment to make such payments from its profits despite the fact that it cannot recoup them from its rate payers". (Pacific Tel. & Tel. Co. v. Public Utilities Comm., 34 Cal. 2d 822, 832, supra; see New Jersey Bell Tel. Co. v. Board of Pub. Utility Comrs., 12 N. J. 568, 592, supra; cf. Southwestern Elec. Power Co. v. Federal Power Comm., 304 F.2d 29, 47, cert. den. 371 U. S. 924.)
*381 The commission, therefore, has the undoubted power to investigate the prices charged by affiliated suppliers of a telephone company, and we conclude that such power was properly exercised in this case. The petitioner argues that it was error, as a matter of law, to determine that it was being overcharged since, in fact, it pays no more, and sometimes considerably less, than the prices which independent telephone companies  i.e., companies unallied with the AT&T (Bell) or GT&T systems  are charged by GT&E affiliates or by GT&E competitors for comparable goods and services. Although the cases relied upon by the petitioner may lend some support for this view (see Matter of Montana-Dakota Utilities Co., 102 N W 2d 329, 338 [N. D.]; see, also, Matter of General Tel. Co. of California, 25 PUR 3d 129, 133-136 [Cal. Pub. Util. Comm.]; Matter of General Tel. Co. of Missouri, 43 PUR 3d 366, 379 [Mo. Pub. Serv. Comm.]; Washington Pub. Serv. Comm. v. General Tel. Co. of the Northwest, 30 PUR 3d 145, 152-154 [Wash. Pub. Serv. Comm.]), we decline to follow them.[3]
There is no constitutional requirement that prevailing market prices must be accepted as the standard for testing the reasonableness of operating costs (see Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 152-153), nor would it have made sense to adopt such a standard in this case. The commission focused principally on sales to the petitioner by three wholly owned GT&E subsidiaries  Automatic Electric Company (AE), General Telephone Directory Company and Leich Electric Company (Leich). AE manufactures specialized telephone equipment *382 and, apart from Western Electric which deals almost exclusively with the Bell system, AE produces more of such equipment than all other manufacturers combined. Approximately half of its total sales are made to GT&E telephone companies. Leich furnishes standard telephone supplies to its customers, over 80% of whom are GT&E affiliates; the Directory Company, nearly four fifths of whose business has been with affiliates, specializes in yellow page advertising and the compilation of telephone directories. The independent telephone market is fragmented, while the GT&E telephone companies can, in view of their combined bargaining power and the volume of business generated, virtually dictate at will the prices to be charged by their affiliated suppliers. Under these circumstances, "little, if any, weight" can be accorded to price comparison in judging whether or not the petitioner was overcharged. (Pacific Tel. & Tel. Co. v. Public Utilities Comm., 62 Cal. 2d 634, 660; see Western Distr. Co. v. Comm., 285 U. S. 119, 126; Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 152-153, supra; Mississippi Riv. Fuel Corp. v. Federal Power Comm., 252 F.2d 619, 621-623, cert. den. 355 U. S. 904; Matter of Michigan Bell Tel. Co., 5 PUR 3d 301, 306-307, 315 [Mich. Pub. Serv. Comm.]; Pennsylvania P. U. C. v. York Tel. & Tel. Co., 53 PUR 3d 146, 153 [Pa. Pub. Util. Comm.]; Matter of General Tel. Co. of Wisconsin, 34 PUR 3d 497, 511-512 [Wis. Pub. Serv. Comm.], affd. 46 PUR 3d 1 [Wis. Cir. Ct.].) In short, the commission, to cull from its opinion, rejected "comparative prices fixed in the * * * independent telephone market * * * as [a valid test] of the reasonableness of these affiliated transactions", and it may not be said that the agency acted arbitrarily or without substantial evidence.
The commission concluded that the petitioner was being overcharged from the fact (which it found) that, through the instrumentality of the corporate combine, the affiliates had, in effect, been dealing with themselves and enjoying profits which were "higher than either fairness or arm's-length bargaining would dictate". The affiliates' net returns on investment varied on an annual basis from 19% to 56%. Based in part on surveys submitted by the petitioner's own expert witness, the commission held that 12% was the maximum reasonable rate of return for those companies and treated the excess as the product of inflated prices.
*383 The petitioner complains about the manner in which these earnings were determined to be exorbitant. The commission computed net returns on investment by comparing the net annual income with the "historical book value" of each affiliate. It is contended that the proper yardstick for measuring earnings is not such "book value" but rather "acquisition cost". Historical book value represents, of course, the original cost of the capital assets less depreciation taken over the years. Acquisition cost, as used by the petitioner, means the actual price paid by GT&E when it purchased the subsidiary. Since GT&E acquired its subsidiaries long after they were going concerns, there is a substantial difference between the book values and the acquisition costs of some of them.[4] The petitioner urges that, if the commission is going to measure the net return on investment of a GT&E subsidiary, it should determine the net return on GT&E's investment rather than on the far smaller investment originally made by GT&E's predecessor.
We conclude (as to this aspect of the case) that the commission acted properly. The Public Service Law places upon the telephone company the burden of showing that a proposed change of rates is just and reasonable (§ 92, subd. 1; § 97, subd. 1). At the hearing, the petitioner's expert witness submitted an exhibit which contained, among other items, a table showing per centum returns on historical book value for major manufacturing groups. The table indicated that the electric equipment group  in which GT&E's subsidiaries are included  had an average return of 10.1%. Another table, setting forth the returns of individual electric machinery companies above a *384 certain size, credited Western Electric Co., the manufacturing subsidiary of AT&T, with a return of 10.7%. The commission's determination of a 12% return on a comparable base, namely, historical book value, would appear to demonstrate a due, if not indeed a generous, regard for GT&E's profits on its investment in these subsidiaries.
It is undoubtedly true that GT&E paid considerably more than the historical book value of these companies in order to acquire them as going concerns. However, a similar disparity undoubtedly exists on the books of Western Electric and the other companies represented in the tables since the capital assets of business enterprises are ordinarily carried on the books of account in terms of historical book values. These figures, then, are readily available and, as the tables indicate, frequently employed by the business community for comparative purposes. Although such a yardstick is not, and cannot be, exact, it does serve and is used in the business world to measure the relative profitability of different companies and different industries. If the figures were, for one reason or another, not comparable, then, it was incumbent on the petitioner to indicate the extent to which that was so.
In order to determine whether profits are fair rather than excessive, the commission must ascertain what similar enterprises are earning on a similar basis. The petitioner has suggested "acquisition cost" but it made no effort to introduce comparable data on this basis; on the contrary, the only evidence it offered were the very tables which the commission employed in reaching its determination. Moreover, there is a circularity of reasoning in the proposition that contemporaneous stock market quotations are the proper yardstick to test the fairness of the prices charged by a manufacturing concern. As a matter of common understanding, the profitableness of an enterprise will influence the market price of its stock; it is putting the cart before the horse, therefore, to measure the fairness of the manufacturer's price for its product by the price paid by investors for its stock. Under such circumstances, the commission was privileged to evaluate the data  proffered, we would note, by the petitioner itself  in terms of a common sense approach which accorded with standard accounting and business practices. (See Pennsylvania P. U. C. v. York Tel. & Tel. Co., *385 53 PUR 3d 146, 190-193 [Pa. Pub. Util. Comm.], supra; Matter of General Tel. Co. of Wisconsin, 34 PUR 3d 497, 512-514 [Wis. Pub. Serv. Comm.], affd. 46 PUR 3d 1 [Wis. Cir. Ct.], supra.)
The result thus reached by the commission constitutes no denial of equal protection of the laws. It may well be, as the petitioner argues, that, if the prices it pays to its affiliates are inflated, then, the identical prices charged to the independent telephone industry must also be inflated. It does not follow, however, that the State and Federal Constitutions prohibit the commission from "discriminating" between affiliated and independent telephone companies when attempting to eliminate the abuse. The commission lacks the power to order a reduction in the prices charged by these suppliers. Therefore, even if those prices are exorbitant, they cannot be excluded from the rate base of an independent telephone company. To do so would penalize the utility for a state of affairs over which it has no control and, as is self-evident, such a result would constitute a deprivation of property without due process of law. The situation is, however, patently, and significantly, different when both the telephone company and its supplier are owned by the same parties. If the commission prevents the utility from including overcharges in the rate base, the practical effect is simply to cause a reduction in the affiliate's prices. Manifestly, the telephone company must not be permitted to recover from its rate payers for excessive charges if it possesses the power to prevent such charges. Nor may the affiliated supplier be heard to raise a constitutional objection to this indirect regulation of its profits. The Legislature could go further, if it so desired, and require approval in advance of such dealings between a utility and an affiliate. (See Matter of International Ry. Co. v. Public Serv. Comm., 264 App. Div. 506, affd. 289 N.Y. 830, supra.)
Whether telephone rates are "just and reasonable" depends upon the particular telephone company for which the rates have been prescribed. It is not error for the commission to conclude that certain expenses are warranted for small independent companies with limited bargaining power, while these same expenses are unwarranted for large integrated enterprises with unrestrained bargaining power. (See A. T. & T. Co. v. United States, 299 U. S. 232, 239; Columbus Gas Co. v. Comm., 292 U. S. 398, 400, supra; *386 Dayton P. & L. Co. v. Comm., 292 U. S. 290, 295; Western Distr. Co. v. Comm., 285 U. S. 119, 124, supra; Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 152-153, supra.) Whatever may be the constitutional limits to the regulation of public utilities, they do not require the commission to overlook the differences between Brobdingnag and Lilliput.
In sum, there was no constitutional obstacle to the investigation conducted by the commission of the prices charged by the petitioner's affiliates and the resulting order, far from being arbitrary and unreasonable, was supported in all respects by substantial evidence.
The order of the Appellate Division should be affirmed, with costs.
VAN VOORHIS, J. (dissenting).
By circuitous reasoning, as it seems to me, the court majority is circumventing the Legislature, which has repeatedly declined to pass legislation designed to confer jurisdiction upon the Public Service Commission to determine allowable earnings of affiliated suppliers of public utilities and, in authorizing the regulation of such earnings as affected by sales to affiliates, is overruling Matter of New York Tel. Co. v. Public Serv. Comm. (309 N.Y. 569) by holding that a fair return can be based exclusively on cost less depreciation.
Sections 91, 92 and 97 of the Public Service Law authorize the commission to fix utility rates, and subdivision 3 of section 110 provides that no management, construction, engineering or similar contract made with any affiliated interest shall be effective unless filed with the commission and that "no charge for any such management, construction, engineering or similar service, whether made pursuant to contract or otherwise, shall exceed the reasonable cost of performing such service." This provision, added by chapter 279 of the Laws of 1934, was intended to prevent profiteering through excessive payments by utilities of the nature specified in the statute. Attempts to amend this subdivision by adding contracts for the purchase of materials or supplies by a public utility from a manufacturing subsidiary have failed of passage[*]. Quite evidently the Legislature *387 has considered that there is a difference between purchase of materials and supplies from affiliates and management, construction, engineering contracts and the like. Materials and supplies ordinarily have market value, by which can be tested whether or not they have been acquired by the utility at inflated prices.
Manifestly it is within the powers of the Public Service Commission, in establishing a rate base, to inquire into whether materials and supplies have been purchased at fair market values, but that is quite a different matter from ruling that however cheaply they may have been procured or efficiently manufactured, no benefit can redound to the parent company through the profits (above a percentage set by the Public Service Commission) of the supplying subsidiary from the sales in question.
In determining whether the prices charged to the operating utility company are fair and reasonable, it is the function of the Public Service Commission to examine into whether there is a market for such products and, if so, whether the prices charged conform thereto. If there be no free market for such goods measured by purchases and sales, then it is necessary to resort to other factors in order to determine the value (Heiman v. Bishop, 272 N.Y. 83). There is a marked distinction, as the court there pointed out, between the method of proving the market value of a commodity dealt in by many persons and in a large number of transactions, so that a definite price or range of prices is established and the commodity may be said to have a market price which is quoted in the market and varies from time to time, depending largely upon supply and demand, and a situation where there are few, if any sales, and then under forced conditions and not in a free market. Under the latter circumstances, other factors need to be resorted to but  certainly in any other than the public utility field  the fair and reasonable prices of such commodities would not be determined exclusively by the operating profit of the producing company, which takes no account of efficiency or the lack of it and good or bad management in production or distribution.
It is said that because appellant's parent corporation owns its producing affiliates, known as Automatic Electric Sales Corporation (described as AE), Leich Electric Company and Leich *388 Sales Corporation (described as Leich) and General Telephone Directory Company (described as Directory Company), it determines the prices at which their materials and supplies are sold. That may be true, but it does not answer the basic question which is whether they conform to the prices established in a competitive market. Respondents have not inquired into that phase of the subject, being content to point out that AE sells from 50 to 70% of total telephone equipment sales to the "independent" utilities (i.e., other than AT&T), and that AE's sales to its system telephone companies have constituted 38 to 45% of its total sales, and 53% to domestic telephone companies. Ignored is the circumstance that its prices to system telephone companies have increased less than the general price level since it was acquired by appellant's parent company in 1955, and that it is in a market which actively competes with strong companies such as General Dynamics Corporation, I. T. & T. Company, L. M. Ericsson Telephone Company and Graybar Electric Company. AE sells approximately $150,000,000 of equipment purchases to independent and nonaffiliated telephone companies, in this competitive field.
The majority opinion also overlooks, as it seems to me, that the prices paid by appellant were the same or lower than the prices charged by nonaffiliated competitors of AE in transactions with purchasers dealing at arm's length.
Leich was merged into AE in 1962, and is not separately considered.
The Directory Company deals at arm's length with 220 companies having no affiliation with the General System, as well as with 25 General System Companies. In seeking customers it actively competes with strong national and regional companies.
The nonaffiliated customers account for more than half of AE's equipment sales and a fifth of the Directory Company's sales.
Respondents appear to take for granted that the Public Service Commission has power to pass upon the earnings of these manufacturing affiliates for the reason that AE, it is said, has not earned less than 19% since 1955 on that portion of its invested capital represented by its common stock and surplus, that Leich earned a substantial return prior to merger with AE, and the Directory Company likewise. The conclusion does not *389 follow that the prices charged to appellant were too high unless, regardless of profit or loss by these producing affiliates in a competitive market, the prices of the goods which were sold were too high. They were not too high simply because these affiliates were making money from which the stockholders of the parent company benefited, unless the Legislature rendered producing affiliates subject to rate regulation which it has not done and has declined to do. Evidently the Legislature has considered that there are advantages to the consuming public in utility companies' having manufacturing subsidiaries or affiliates, and without penalizing their operation by placing a premium on inefficiency. This, as it seems to me, is a policy question for the Legislature rather than the courts. Statutes differ from one another in other states; some of them authorize the regulation of profits of producing companies in this situation. We are not bound by those decisions but, on the contrary, are called upon to enforce our own legislative policy rather than to follow the statutes of several other states which are different from our own. This appears to be recognized as a case of first impression in this court, and such decisions as there are in this State point in an opposite direction.
Some stress has been laid upon the case of Smith v. Illinois Bell Tel. Co. (282 U. S. 133, 152-153), involving the Western Electric Company and AT&T. The United States Supreme Court spoke of Western Electric as being virtually the manufacturing department of AT&T. Concerning that the following comment by the California Commission is pertinent, when it was urged that the Western Electric and AE situations were similar, that (25 PUR 3d 129, 134), "As a matter of fact, the two situations are unlike in a number of important respects and there are numerous distinctions between the corporate relationships and the methods of transaction of business of the two. Equipment sold and manufactured by the subsidiaries of General Telephone Corporation is widely distributed to many independent telephone companies which have no affiliate relationship with it."
The New York Commission has pointed out that for years approximately 90% of Western Electric's output has been sold to AT&T companies (Matter of New York Tel. Co., 84 PUR [NS] 267, 284). The Regulatory Commissions of California, *390 Missouri and Washington have ruled that the prices of both AE and the Directory Company are in line with market prices and allowable in full (Matter of General Tel. Co. of California, 25 PUR 3d 129 [Cal. Pub. Util. Comm., 1958]; Matter of General Tel. Co. of Missouri, 43 PUR 3d 366 [Mo. Pub. Serv. Comm., 1962]; Washington Pub. Serv. Comm. v. General Tel. Co. of the Northwest, 30 PUR 3d 145 [1959]).
If the power to regulate, directly or indirectly, profits of manufacturing subsidiaries or affiliates is to be conferred by the court upon the Public Service Commission, and competitive prices of similar materials and equipment in a free market are to be ignored, then the rate base of the producing corporation should be determined in accordance with the principles of valuation previously laid down by the courts (Matter of New York Tel. Co. v. Public Serv. Comm., 309 N.Y. 569, supra). That does not necessarily signify that the parent company's investment in AE is the yardstick, although it may be a factor to be taken into account, but it is inconsistent with treating cost less depreciation of the physical equipment, and of the physical equipment alone, as the sole standard for measuring value. That was the contention made on behalf of the Public Service Commission and overruled in Matter of New York Tel. Co. v. Public Serv. Comm. (supra).
The order appealed from should be reversed and the determination of the Public Service Commission annulled.
Order affirmed.
NOTES
[1] A similar procedure was followed by the commission when, in an earlier proceeding, it approved only part of a prior rate increase requested by this petitioner. (Matter of General Tel. Co. of Upstate New York, 41 PUR 3d 1, 17-23.) No review was sought of the commission's action at that time.
[2] See, e.g., A. T. & T. Co. v. United States, 299 U. S. 232, 239; Columbus Gas Co. v. Comm., 292 U. S. 398, 400, supra; Dayton P. & L. Co. v. Comm., 292 U. S. 290, 295; Western Distr. Co. v. Comm., 285 U. S. 119; Mississippi Riv. Fuel Corp. v. Federal Power Comm., 252 F.2d 619, 621-623, cert. den. 355 U. S. 904; Pacific Tel. & Tel. Co. v. Public Utilities Comm., 34 Cal. 2d 822, 830, supra; State ex rel. City of St. Joseph v. Public Serv. Comm., 325 Mo. 209, 223-225; New Jersey Bell Tel. Co. v. Board of Pub. Utility Comrs., 12 N. J. 568, 591-592, supra; Matter of New England Tel. & Tel. Co., 115 Vt. 494, 508.
[3] No purpose is to be served by detailed discussion of Matter of Republic Light, Heat & Power Co. v. Public Serv. Comm. (265 App. Div. 74), upon which the petitioner also relies. That case may well be distinguished from the present but, even if we were to regard it as indistinguishable, we would not follow it or subscribe to certain of the language contained in its opinion which seems to support the petitioner's position. More specifically, we favor the variant view expressed by the same court (as decided Republic) in the case now before us (22 A D 2d, at p. 444), namely, that "[t]he issue is not the right of a supplier to a particular price or the right of its customer to pay it, but, rather, the right of the commission to enforce the paramount public interest in a rate that shall not reflect inflated costs" and that, if "inquiry into and scrutiny of profits * * * do disclose the unreasonableness of the intercompany charges, despite comparable charges by others", the commission has the right to make a proper adjustment.
[4] For example, GT&E acquired AE in a series of transactions that took place between 1955 and 1961 involving the exchange of GT&E stock for three blocks of stock in AE's parent company, Theodore Gary & Company. The latter was ultimately merged into GT&E, leaving AE as a wholly owned subsidiary. By assigning values to GT&E stock based on the market value of the stock on the day of each exchange for Gary stock, the cost to GT&E of acquiring AE can be computed at approximately $135 million. The commission used AE's historical book value of approximately $50 million as the appropriate basis for measuring AE's earnings and concluded that the returns had ranged from 19% to 32%  considerably in excess of the 12% deemed reasonable. If the petitioner's "acquisition cost" figure were used as the "yardstick", the highest return by AE in any year would have been 12.57% and, in the most recent year, 9.84%.
[*] Assem. Int. No. 597, 1936 Sess.; Sen. Int. No. 10, 1937 Sess.; Assem. Int. No. 16, 1938 Sess.; N. Y. Legis. Doc., 1938, No. 39, p. 20; N. Y. Legis. Doc., 1939, No. 39, pp. 16-17; N. Y. Legis Doc., 1940, No. 39, p. 44.