OPINION OF THE COURT
Hancock, Jr., J.
On January 1, 1984 petitioner, New York Telephone Company, entered into a contract pertaining to its telephone directory services with an affiliated company, NYNEX IRC.[1] During the term of this contract, known as the Directory Publishing Agreement (DPA), the affiliate undertook the responsibility for operating the Telephone Company’s directory business and for providing alphabetical listing and Yellow Page advertising services to its customers. The principal question in this appeal by the Public Service Commission (hereinafter PSC or Commission) is whether it has authority under the Public Service Law to disapprove the DPA as not in the public interest. The Commission, in a proceeding brought to investigate the DPA, concluded that it had such authority under Public Service Law § 110 (3) under which it is authorized to disapprove "management, construction, engineering or similar” contracts made by a regulated utility with an affiliate; it also found such authority under certain provisions of article 5 of the Public Service Law including section 99 (2). Based on the evidence in a hearing held before an Administrative Law Judge, the Commission disapproved the DPA.
After the Telephone Company’s request for a rehearing was denied, it commenced the instant CPLR article 78 proceeding which Supreme Court transferred to the Appellate Division (CPLR 7804 [g]). That court held, on the authority of Matter of General Tel. Co. v Lundy (17 NY2d 373), that the Commission lacked jurisdiction to invalidate the DPA under Public Service Law § 110 (3) (132 AD2d 33). It also rejected the PSC’s claim of *423 jurisdiction under other provisions in Public Service Law article 5. Accordingly, without reaching the issue of whether the DPA was in the public interest, the Appellate Division granted the Telephone Company’s petition and annulled the Commission’s determinations. We granted the PSC’s motion for leave to appeal and now reverse.
 Because we hold that the PSC does have the requisite authority under Public Service Law § 110 (3), we need not discuss its claims of authority under other provisions of the statute. We conclude, moreover, that the Commission’s determination that the DPA is not in the public interest has a rational basis and is not arbitrary or capricious. Accordingly, the petition should be dismissed and the determinations of the PSC reinstated.
I
Prior to the effective date of the restructuring of the Bell System (see, United States v American Tel. & Tel. Co., 552 F Supp 131 [DC 1982], affd 460 US 1001 [1983]), the Telephone Company managed its own directory operations and provided alphabetical listing services to its subscribers. It also offered classified advertising in the Yellow Pages, which produced substantial profits considered by the Commission in setting telephone rates and ultimately returned to the subscribers in lower charges. The furnishing of White Page telephone listings is a service required as part of the Telephone Company’s responsibilities to its customers and, as such, is fully regulated by the Commission (see, e.g., 16 NYCRR 603.4). Although Yellow Page advertising is not a regulated service, the PSC nevertheless exerts limited authority over it "to see that all advertisers are treated equitably, and to insure that maximum revenues are derived from the sale of advertisements” (Matter of National Merchandising Corp. v Public Serv. Commn., 5 NY2d 485, 490; see, Matter of Solomon v Public Serv. Commn., 286 App Div 636, 639-640; Matter of Certain Subscribers v New York Tel. Co., [1937] 1 PSC 676, 20 PUR [NS] 223).
One aspect of the Bell System restructuring as finally approved by the Federal court in the AT&T antitrust case is of particular relevance here. This is the court’s rejection in its decision (United States v American Tel. & Tel. Co., supra) of the requirement being proffered by AT&T for inclusion in the proposed settlement — that the divested operating companies, *424 such as petitioner, be barred from all activities relating to directory advertising in the Yellow Pages. The AT&T proposal was that the operating companies should auction off their directory businesses to the highest bidder, presumably AT&T (552 F Supp, at 193, n 257, supra). In holding that the proposal was not in the public interest Judge Greene — noting that no one disputed that the Yellow Pages provided a significant subsidy to local telephone rates — stressed the obvious point that the "loss of this large subsidy would have important consequences for the rates for local telephone service” (id., at 194).
Sometime before the impending Bell System divestiture date, NYNEX created an additional subsidiary, NYNEX IRC, and caused the Telephone Company to transfer to this new NYNEX subsidiary the Telephone Company staff (consisting of approximately 360 employees) which had been running its directory operations. The Telephone Company and NYNEX IRC — both NYNEX subsidiaries — then entered into the DPA, the contract in question.
The basic term of the DPA is for five years from January 1, 1984. There is a provision for automatic renewals for periods of one year unless either party, at least 12 months prior to an expiration date, gives notice of its intention not to renew. During the agreement, NYNEX IRC is obligated to "produce, publish and distribute” telephone directories for the Telephone Company’s subscribers; it is granted the exclusive right to contact the subscribers in the Telephone Company’s name "for the purposes of soliciting and obtaining Directory Advertising” and the right to use certain Telephone Company software systems necessary for the directory operation. The Telephone Company agrees to furnish the listing and other information required for NYNEX IRC to perform its function under the DPA; also, acting as agent for NYNEX IRC, it agrees to employ its own regular subscriber billing and collection system for the purpose of billing and collecting the advertising and special listing charges made by NYNEX IRC to its customers.
The DPA provides that NYNEX IRC will pay an annual directory publishing fee to the Telephone Company based upon its 1983 advertising profits adjusted each year for growth and inflation in addition to a sum to reimburse the Telephone Company for its billing and collection services. The profits in excess of this amount are retained by NYNEX IRC.
*425 Based upon its analysis of the DPA and of the record, including particularly the testimony of certain Telephone Company witnesses,[2] the PSC found that "the directory business belongs to New York Telephone but that NYNEX IRC will manage it for five years” (emphasis in original) ([1986] 26 PSC 1183, 1190, 1192); that in "structuring their obligations under the DPA, the companies have attempted to defeat [the Commission’s] jurisdiction by channeling the flow of 'charges’ from New York Telephone to its affiliate. That is, instead of having New York Telephone pay its affiliate for managing its Yellow Pages business, the contract, in form, calls for the NYNEX affiliate to pay New York Telephone a portion of 'its’ profits” (id..); and that "[a]s the record establishes, NYNEX IRC has contracted to manage New York Telephone’s directory business for five years. In return for the provision of this service, it is, in effect, charging New York Telephone the portion of system profits it is not returning” (id.).
In reaching the legal conclusion that it had jurisdiction to invalidate the DPA under Public Service Law § 110 (3) as a "management, construction, engineering or similar contract”, the Commission disagreed with the ALJ whose contrary view, like that of the Appellate Division (132 AD2d 33), was based essentially on his reading of our decision in Matter of General Tel. Co. v Lundy (17 NY2d 373, supra).
The Commission’s determination that the DPA was not in the public interest was also at odds with the recommendation of the ALJ.[3] In its decision on the public interest question, the PSC adopted the position of its staff and rejected the contrary *426 position of the Telephone Company on three principal propositions: (1) the base level earnings figure used in the DPA was understated; (2) the growth and inflation factors used did not reflect the historic annual increases in the directory business; and (3) the increases in competition due to deregulation would not affect earnings to the degree urged.
In its motion for a rehearing the Telephone Company contended, inter alia, that developments after the initial hearing had confirmed its earlier predictions concerning competition from former Bell System operating companies. The PSC found "no significant new developments that warranted] rehearing” in this or the company’s other contentions and, accordingly, denied the motion.
II
We turn to the legal question of the Commission’s authority to invalidate the DPA under Public Service Law §110 (3). The company contends first that the term "management contract” as employed in the statute refers only to the type of contract which confers the degree of control that utility holding companies, in the early part of this century, exerted over their subsidiary local operating companies — i.e., "the all-encompassing power to run the local operating company’s business lock-stock-and-barrel.” No language in section 110 (3)[4] or elsewhere in the statute supports this narrow construction. Nor does anything in the legislative history.
It is true that section 110 (3) was not written to cover all contracts between a utility and an affiliate but only specific categories of contracts — i.e., "management, construction, engineering or similar” contracts. But section 110 (3) is not limited to any particular type of "management contract”, and the *427 statute contains no definition or other language suggesting a more precise meaning of the term. Thus, there is no reason to read "management contract” as being limited to a contract which delegates total control and direction over an entire business. Nor, contrary to the Telephone Company’s contentions, does the natural and ordinary meaning of the word "manage”[5] suggest that the control which the word connotes must be control over an entire concern or business and not over a part of it.
We find no evidence in the legislative history surrounding the original enactment of section 110 (3) (added L 1930, ch 760) supporting the company’s argument that the Legislature was concerned only with contracts between affiliates of the sort which relinquished "lock-stock-and-barrel” control or management over an entire operating company. Indeed, the very fact that the Legislature made the statute applicable to contracts where no such total control could exist — i.e., "construction, engineering or similar contract^]” — is persuasive evidence that it intended no such limitation. It is true, of course, that it was primarily abuses in the contractual arrangements between utility holding companies and their subsidiary operating companies which prompted the Legislature to take corrective measures in enacting section 110 (3) (L 1930, ch 760, § 1; see, e.g., Report of Commn on Revision of Public Service Commissions Law, 1930 NY Legis Doc No. 71 [Feb. 28, 1930]). The underlying purpose of the legislation was to prevent the utilities from insulating themselves from regulatory control through these contractual devices so that they could charge large fees "at the expense of the operating company and ultimately the consumer” (see, Report of William J. Donovan, Counsel to NY Law Rev Commn, 1930 NY Legis Doc No. 75, at 63 [Feb. 23, 1930]). Nothing in the legislative history suggests that this overriding legislative concern with preventing the utility owners from diverting profits to the owners at the expense of the ratepayers was confined to abuses in the "lock-stock-and-barrel” type of management contract (see, e.g., Report of Commn on Revision of Public Service Commissions Law, op. cit.; Report of William J. Donovan, Counsel to NY Law Rev Commn, op. cit.). Such a *428 restricted reading of Public Service Law § 110 (3) would frustrate the very ameliorative purpose of the legislation and should be avoided (see, Matter of Capital Newspapers v Whalen, 69 NY2d 246, 254; Ferres v City of New Rochelle, 68 NY2d 446, 451-452).[6]
The question remains whether the DPA should be considered a "management contract” even under the broader construction of the term adopted by the PSC. We have no difficulty in concluding that it should be. Under the DPA, NY-NEX IRC is given total control over and responsibility for the management of the Telephone Company’s directory business. The company’s software, customer lists and other data, as well as approximately 360 of its employees are transferred for this purpose. NYNEX IRC assumes the obligation of meeting the Telephone Company’s responsibilities in providing directory service to its subscribers consistent with the company’s established policies and practices. Simply put, during the term of the DPA the systems remain the property of the Telephone Company but NYNEX IRC assumes the responsibility of running them and is paid for its services. That this payment takes the form of the Telephone Company’s relinquishment of all profits over a stipulated sum does not make it any less a payment by the Telephone Company to NYNEX IRC for managing the directory operations. Indeed, one of the Telephone Company’s witnesses frankly conceded this in his description of NYNEX IRC’s role under the DPA as "doing the work for us in return for payment”.
Contrary to the position of the Telephone Company, our decision in Matter of General Tel. Co. v Lundy (17 NY2d 373, supra) does not stand for the proposition that a contract pertaining to directory services may never constitute a management contract under Public Service Law § 110 (3). No reason is suggested for such a rule. Clearly, a management
*429 contract can be entered into for any business or for some identifiable portion of it. What makes an arrangement a management contract is the degree and nature of the control and responsibility delegated. This is the issue we have examined here in determining whether the Telephone Company has vested NYNEX IRC with the authority to "manage” its directory publishing operations. This, however, was not the issue in Matter of General Tel. Co. v Lundy (supra). There, the question was whether the PSC could — in establishing utility rates in its ratemaking process — inquire into the reasonableness of certain contracts made with subsidiaries. We assumed that these contracts — various contracts for supplying specialized telephone equipment and standard telephone supplies and for furnishing directory services — did not fall within the categories of "management, construction, engineering or similar” contracts which the PSC could invalidate under section 110 (3). Notwithstanding this assumed lack of authority under section 110 (3), however, we held that the Commission could— for ratemaking purposes — examine the reasonableness of the expenditures called for under the contracts. The question of whether the particular contract pertaining to directory publishing services was a management contract under section 110 (3) was not in issue and never raised.
III
The remaining question involves the Commission’s determination that the DPA should be disapproved. Because the DPA is a contract covered by section 110 (3), the PSC was authorized to disapprove it if, after an investigation and a hearing, "it be found that [the contract] is not in the public interest” (Public Service Law § 110 [3]). Like the setting of utility rates, the question of whether a given contract is contrary to the public interest is a matter presenting "technical problems which have been left by the Legislature to the expertise of the PSC (see, Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 NY2d 661, 672)” (Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 217-218); and it is only when the exercise of the PSC’s judgment in the matter "can be shown to be without any rational basis or any reasonable support in the record [that] its determination [may] be set aside” (id., at 218).
*430 We find substantial evidence to support the Commission’s findings that the base level 1983 earnings figure was understated and that the growth and inflation factors used did not accurately reflect the historic trend in the directory business. The finding — that the earnings figure was understated because certain expenses were improperly allocated in the DPA —is supported by evidence introduced by the staff and by the Commission’s prior determination in a recent case (see, [1985] 25 PSC 3699, 3726-3729 [Case 28961, Opn No. 85-17]). The Commission’s finding that the DPA used unreasonably low growth and inflation factors was also supported by staif evidence which showed that the annual increases in the directory publishing fee permitted under the DPA were substantially under the corresponding actual directory earnings increases during the years 1979-1983.
Moreover, there is substantial evidence to support the Commission’s determination that increases in competition due to deregulation would not affect earnings to the extent urged by the Telephone Company. Although the Telephone Company argues that the Commission did not properly consider the probable effect from anticipated new competition, specifically from Southwestern Bell, the record reflects that a major portion of the hearing was devoted to this issue. The record supports the factual findings of the PSC that "competition existed in the past but that competitors were unable to make substantial inroads into New York Telephone’s revenue growth”; that the Telephone Company had failed "to demonstrate that circumstances have changed in a manner that would affect New York Telephone’s competitive edge vis-a-vis the large independent publishers that have competed with New York Telephone in the past”; and that in its presentation the company failed to consider adequately "the upside potential for continuing strong revenues and profit growth in spite of any effects of changes in the directory market” ([1986] 26 PSC, at 1230).
In sum, from a review of the record as a whole and the several grounds assigned by the Commission for its conclusion that the DPA was not in the public interest, we cannot say that the PSC’s determination was without any rational basis or any reasonable support in the record (see, Matter of Abrams v Public Serv. Commn., supra, at 217, 218). Accordingly, the *431 judgment of the Appellate Division should be reversed, with costs, the petition dismissed and the determinations of the Public Service Commission reinstated.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Bellacosa concur.
Judgment reversed, etc.

. Both New York Telephone Company and NYNEX Information Resources Company (NYNEX IRC) are wholly owned subsidiaries of NYNEX. The parent corporation, NYNEX, was created after the Bell System’s breakup and has other subsidiaries including New England Telephone.

. Arthur Flaherty, Telephone Company division staff manager, for example, characterized the DPA as "almost like a license during that period, and that covers their doing the work for us in return for payment”; Joseph Gustafson, a Telephone Company division manager, stated that for the "term of the DPA, NYNEX IRC agrees to compile, publish and deliver white and yellow pages directories for the Company in a manner consistent with the Company’s established policies and practices”; and Donald Trawicki, a consultant hired by the Telephone Company, testified that there "is no provision for the return of the personnel [under the DPA], but the systems remain the property of New York Telephone Company”.

. Although concluding that the PSC lacked jurisdiction over the DPA under Public Service Law § 110 (3) and not addressing the PSC’s contentions that it had jurisdiction under Public Service Law § 99 (2) and other article 5 sections, the AU nevertheless considered the case on the merits and in his recommendation found that the DPA was "a reasonable arrangement from the standpoint of NYT’s ratepayers” and that "even if one does not agree that NYT read the future correctly here, the record does not support a *426 finding that the Company was imprudent. The record instead indicates that NYT studied the matter carefully before entering into the DPA arrangement, and that its decision to do so was at the very least based upon rational considerations”.

. Public Service Law § 110 (3): "No management, construction, engineering or similar contract, hereafter made, with any affiliated interest, as hereinbefore defined, shall be effective unless it shall first have been filed with the commission, and no charge for any such management, construction, engineering or similar service, whether made pursuant to contract or otherwise, shall exceed the reasonable cost of performing such service. In any proceeding to determine the reasonable cost of such charge or service the burden of proof shall be on the company. If it be found that any such contract is not in the public interest, the commission, after investigation and a hearing, is hereby authorized to disapprove such contract.”

. The definition of the word "manage” quoted in the company’s brief is as follows: "To control and direct, to administer, to take charge of. To conduct; to carry on the concerns of a business or establishment. Generally applied to affairs that are somewhat complicated and that involve skill and judgment” (Black’s Law Dictionary 865 [5th ed]).

. The Telephone Company also argues that the Legislature’s failure to enact various proposed amendments to section 110 (3) which would have given the PSC expanded power to disapprove contracts is indicative of a legislative intent that the term "management contract” should be given the narrow construction it urges. Initially, we note that because of its "inherent ambiguity”, legislative inaction provides a dubious foundation from which positive inferences may be drawn (Clark v Cuomo, 66 NY2d 185, 190-191). Moreover, the amendments in question did not relate to the scope of the term "management contract”. Rather, they either sought to subject additional types of contracts — e.g., auditing, accounting or appraisal — or all contracts with subsidiaries to Commission approval. Thus, they shed no light on what is covered by the term "management contract”.